IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FREDERICK GIBBONS,               *
                                 *
          Plaintiff,             *
                                 *
     v.                          *          CV 114-056
                                 *
WILLIAM McBRIDE, individually    *
and in his capacity as Director  *
with the GRU Department of       *
Public Safety, et al.,           *
                                 *
          Defendants.            *

---

ORDER

---

In this action, Plaintiff Frederick Gibbons asserts claims
against the Board of Regents of the University System of Georgia
and seven named officers of the Georgia Regents University
("GRU") Police Bureau, among others unnamed, for deprivation of
his First, Fourth, Fifth, Thirteenth, and Fourteenth Amendment
rights, as well as violations of various state laws, when
Officer Wesley Martin tased him five times during a traffic stop
for an alleged tag violation. In lieu of answering Mr. Gibbons'
Amended Complaint (Doc. 40), Defendants move for partial
dismissal on multiple grounds, including various immunities,
failure to comply with the procedural requirements of the
Georgia Tort Claims Act ("GTCA"), and failure to state claims
upon which the Court can grant relief. For the reasons stated

1

herein, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants'
Partial Motion to Dismiss. (Doc. 42.)

## I. BACKGROUND

### A. Factual Background

Mr. Gibbons, an African-American male, owns and operates
two small businesses in Augusta, Georgia — a used car dealership
and the café-lounge Soultry Sounds. (Am. Compl. ¶¶ 6, 20, 22,
49.) The instant suit arises out of two incidents with the GRU
Police Bureau. The Court summarizes each in turn.

### 1. *September 23, 2010 Traffic Stop*

In the early hours of September 23, 2010, Mr. Gibbons
closed down Soultry Sounds, collected the night's receipts, and
left downtown Augusta in a vehicle with a Dollar Down Auto Sales
("Dollar Down") dealer tag to drive to his house in southern
Richmond County, Georgia. (Id. ¶¶ 20, 21, 23.) While driving
on Wrightsboro Road past the Medical College of Georgia,[1] Officer
Martin stopped Mr. Gibbons because of an alleged problem with
his paper dealer tag. (Id. ¶¶ 25, 27, 28.) In response, Mr.
Gibbons advised Officer Martin that the tag was valid and showed
him the proper insurance verification and identification.
(Id. ¶¶ 28-29.) Officer Martin then decided to ticket Mr.
Gibbons for driving an unregistered vehicle, but requested that

---

[1]     The Medical College of Georgia is one of nine colleges and schools
comprising GRU.

another officer, Jonathan Bennett, sign the citation. (Id. ¶¶ 30, 31.) Mr. Gibbons objected, requesting that Officer Martin sign the citation because Officer Martin made the stop and he wanted to be able to identify Officer Martin in the future. (Id. ¶¶ 32, 33.) Officer Martin refused to sign the citation and, in turn, Mr. Gibbons also refused. (Id. ¶¶ 33, 34.) Mr. Gibbons then changed his mind, but Officer Martin and another officer, Zachary Skinner, refused to allow him to sign the ticket. (Id. ¶¶ 34, 35.) After "snatch[ing]" Mr. Gibbons' cell phone, "Defendants" put cuffs on Mr. Gibbons so tightly that his wrists began to bleed. (Id. ¶¶ 35, 36.)

Four days later, on September 27, 2010, Mr. Gibbons filed an internal affairs complaint against Officers Martin, Skinner, and Bennett about being stopped for a valid dealer tag. (Id. ¶¶ 37, 38.) William McBride, Chief of Police for the GRU Police Bureau and Director of Public Safety at GRU, appointed Kymyatta Turner, a Police Operations Specialist ("POS"), to conduct an investigation into the September 23, 2010 incident. (Id. ¶¶ 8, 14, 39.) According to Mr. Gibbons, POS Turner had no prior training or experience in internal affairs investigations. (Id. ¶ 40.) POS Turner's investigation concluded that Officer Martin "did not break the law, violate any policies of correct police conduct, or otherwise breach any duties to Gibbons in his acts, or failures to act, as to Gibbons." (Id. ¶ 43.) POS

Turner passed on her findings to Chief McBride, and Chief McBride took no action to sanction or punish Officer Martin for his conduct during the September 2010 stop. (Id. ¶¶ 44, 45.)

On December 1, 2010, the Augusta-Richmond County Solicitor General dismissed the citation issued to Mr. Gibbons as a result of the September 2010 stop. (Id. ¶ 46.)

### 2. *March 1, 2012 Traffic Stop*

In the early hours of March 1, 2012, Mr. Gibbons closed down Soultry Sounds, collected the night's receipts and cash, and left downtown Augusta to drive home in a vehicle with a dealer tag listing Soultry Sounds. (Id. ¶¶ 48, 50.) While driving on Wrightsboro Road at around 3:00 AM past the Medical College of Georgia, Officer Martin stopped Mr. Gibbons because "[he] saw the paper dealer tag." (Id. ¶¶ 51-53, 64.) Officer Martin directed Mr. Gibbons to turn onto a dark side road. (Id. ¶ 64.) Once Officer Martin stepped out of his patrol car, Mr. Gibbons recognized him. (Id. ¶¶ 65, 66.) As Officer Martin approached his car, Mr. Gibbons rolled down his window "a couple inches," asked if they could proceed to a well-lit convenience store nearby, and upon Officer Martin's refusal, called 911 to request assistance "because he had been pulled over [for] a paper dealer tag" and "had trouble with [Officer Martin] before." (Id. ¶¶ 68-70.) Officer Martin saw Mr. Gibbons

through the window, recognized him from the September 2010 stop, and heard him requesting emergency assistance. (Id. ¶¶ 67, 71.) Officer Martin began to yell, repeatedly demanding that Mr. Gibbons get out of the car and open the door. (Id. ¶¶ 72, 73.) Officer Martin then announced Mr. Gibbons was under arrest for obstruction, reached inside the cracked driver's side window, and tased Mr. Gibbons five times in rapid succession, thereby delivering 50,000 volts. (Id. ¶¶ 76, 77, 95, 96, 98.) Officer Martin did not give Mr. Gibbons a warning before deploying the taser as required by policy. (Id. ¶ 106.) Mr. Gibbons remained on the phone with 911 during at least the first trigger pull. (Id. ¶ 79.) Eventually the taser wires disintegrated, stopping transmission of the current. (Id. ¶ 99.) The electrodes burned Mr. Gibbons, which resulted in a trip to the hospital. (Id. ¶¶ 78, 97.) During that trip, Officer Martin "taunted" Mr. Gibbons and "talked about how the officers could keep the cash from his business" that was in his car. (Id. ¶ 78.) Mr. Gibbons later was arrested and jailed. (Id.)

The second internal investigation into Officer Martin's conduct, again carried out by POS Turner, and Mr. Gibbons' subsequent criminal trial on the obstruction charge revealed that Officer Martin lied on an official form about Mr. Gibbons' alleged failure to engage him in dialogue during the March 2012 stop. (Id. ¶ 107.) According to Mr. Gibbons, Officer Martin

also "perjured himself while trying to justify his stop by telling the jury Gibbons had no paper tag at all." (Id. ¶ 136.) Officer Martin further explained "that he pulled the trigger of the taser the first time because Mr. Gibbons was non-compliant, and the second time was to frighten Mr. Gibbons into rolling the window down." (Id. ¶ 104.) This explanation is consistent with the fact that Officer Martin did not identify any safety threats or concerns in his police report following the incident. (Id. ¶ 80.) At the same time, GRU Police Bureau policy forbids using a taser to coerce. (Id. ¶ 105.) Officer Martin contended that the final three pulls of the taser trigger "were inadvertent and caused by his hand being stuck in the window." (Id. ¶ 109.) Mr. Gibbons further alleges that another officer, Brian Jackson, likewise perjured himself when he told the jury that Mr. Gibbons "had shot Martin the bird right before the 2012 traffic stop" and had no tag on his car. (Id. ¶¶ 139, 140.)

POS Turner again found nothing wrong with Officer Martin's actions and Chief McBride "ratified Turner's finding about Martin not committing any policy violations and his triple inadvertent trigger pulls." (Id. ¶¶ 108, 118.)

On July 11, 2013, a Richmond County Superior Court jury acquitted Mr. Gibbons of obstruction. (Id. ¶ 135.)

## B.    Procedural Background

On February 28, 2014 — only two days prior to the expiration of the statute of limitations on claims arising out the March 2012 arrest — Mr. Gibbons filed this § 1983 action against Defendants.  In lieu of answering Mr. Gibbons' 31-page, 272-paragraph Complaint, Defendants moved on July 3, 2014 for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e), or in the alternative for partial dismissal. (Doc. 12.)   In that motion, Defendants identified a laundry list of pleading deficiencies, including that each of Mr. Gibbons' thirteen claims fully incorporated every paragraph that preceded it, and some counts in fact double incorporated the preceding facts and other claims;  Mr. Gibbons referred to Defendants collectively, and certain individual Defendants were referenced only in the paragraphs purporting to set forth the underlying facts;  and Mr. Gibbons did not consistently designate the constitutional or statutory source of his claims, or if designated, he did not clarify which Defendants were named under that claim.   (Doc. 38 at 6-7.)   Shortly thereafter, Defendants sought, and the United States Magistrate Judge granted, a stay of discovery pending resolution of Defendants' dispositive motion.   (Doc. 27.)

Mr. Gibbons and Defendants then agreed to extensions of the briefing schedule for Defendants' Rule 12(e) motion.   (Docs. 18,

22.) During the course of briefing, Mr. Gibbons additionally filed a "Motion to Address Conflict of Interests" (Doc. 23), in which he urged that "Defendants should either have different attorneys or should waive their rights to assert their individual and contrary defenses on the record" (Doc. 23-1 at 6). He also filed an objection to the Magistrate Judge's order granting the stay of discovery even though he failed to oppose that motion at the appropriate time. (Doc. 34.) All these motions finally ripened for the Court's consideration on September 30, 2014. Shortly thereafter, Mr. Gibbons filed yet another motion and brief: a preemptive Motion for Leave to Amend, focusing on his supervisory liability claims, in the event the Court granted Defendants' alternative Partial Motion to Dismiss. (Doc. 36.) He also moved for a hearing on all the aforementioned pending matters. (Doc. 37.)

On October 27, 2014, the Court granted Defendants' 12(e) motion and required Mr. Gibbons to re-plead his case with explicit instructions to clearly specify within each count (1) one source of law and/or one legal theory upon which he asserts liability; (2) each defendant against whom he asserts liability on that theory; and (3) the factual allegations that form the basis of each claim against each defendant. (Doc. 38.) Finding that it did not have a well-pleaded complaint before it from which discovery could proceed, see Carter v. Dekalb Cnty., Ga.,

521 F. App'x 725, 729 (11th Cir. 2013), the Court overruled Mr. Gibbons' objection to the Magistrate Judge's imposition of the stay. (Doc. 38.) The Court similarly found Mr. Gibbons' "Motion to Address Conflict of Interests," which the Court construed as a disqualification motion, to be wholly conjectural and, accordingly, premature. (Doc. 39.)

After Mr. Gibbons filed his Amended Complaint on November 10, 2014 — slimmed to 27 pages and 183 paragraphs — Defendants renewed their partial motion to dismiss. (Doc. 42.) The motion is ready for disposition and, for the reasons explained below, is due to be granted in part.

## II. STANDARDS OF REVIEW

### A. Motion to Dismiss on Jurisdictional Grounds

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either a "facial" or "factual" attack. Morrison v. Amway Corp., 323 F.3d 920, 924-25 n.5 (11th Cir. 2003). Defendants' motions, as they relate to immunity, are facial attacks on the Complaint because the Court's resolution of the immunity question does not depend on adjudicating the merits of the case. Haven v. Bd. of Trs. of Three Rivers Reg'l Library Sys., No. CV 213-090, 2014 WL 5872671, at *3 (S.D. Ga. Nov. 12, 2014)("In the Eleventh Circuit, the defense of sovereign immunity is not

merely a defense on the merits. An assertion of Eleventh Amendment sovereign immunity essentially challenges a court's subject matter jurisdiction.")(citations and internal quotation marks omitted); Johnson v. Georgia, No. 1:13-CV-3155-WSD, 2014 WL 1406415, at *2 (N.D. Ga. Apr. 9, 2014) (treating the state's Rule 12(b)(1) motion to dismiss the plaintiff's § 1983 and state law claims on immunity grounds as a facial attack in the absence of citations to extrinsic evidence by the state). In a facial attack on subject matter jurisdiction, the Complaint's allegations are deemed presumptively truthful, and the "court is required merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1233 (11th Cir. 2008) (quoting McElmurray v. Consol. Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir. 2007)).

## B. Motion to Dismiss for Failure to State a Claim

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of both the claim and the supporting grounds. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a defendant's Rule 12(b)(6) motion to dismiss, therefore, a

plaintiff's complaint must include enough "factual allegations to raise a right to relief above the speculative level," and those facts must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Although a complaint attacked by a Rule 12(b)(6) motion need not be buttressed by detailed factual allegations, the plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. The Rule 8 pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 556 U.S. at 555).

At the same time, a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of circumstances that would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Kabir v. Statebridge Co., No. 1:11-CV-2747-WSD, 2011 WL 4500050, at *2 (N.D. Ga. Sept. 27, 2011) (citing Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993)). At this stage, the Court must accept as true all facts alleged in the complaint and construe all reasonable inferences in the light most favorable to the plaintiff. Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002).

## C. Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) and Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)) (alteration and internal quotation marks omitted). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. (citation and internal quotation marks omitted). In other words, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Robinson v. Payton, No. 14-1962, 2015 WL 3937653, at *3 (8th Cir. June 29, 2015) (citing Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority. Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing Vinyard, 311 F.3d at 1346). "Once the defendants establish that they were acting within their discretionary

authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1194 (11th Cir. 2003)). Courts then utilize a two-part framework to evaluate the qualified immunity defense. First, as a threshold inquiry, the Court addresses whether the plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the facts, construed in the light most favorable to the plaintiff, show that a constitutional right has been violated, then the Court asks whether the right violated was "clearly established." Id.

In suits pursued under 42 U.S.C. § 1983, "the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." GJR Invs., Inc. v. Cnty. of Escambia, Fla., 132 F.3d 1359, 1366 (11th Cir. 1998), overruled on other grounds as recognized in Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010); Wooten v. Campbell, 49 F.3d 696, 699 (11th Cir. 1995) (accord). In order to protect public officials from meritless claims, the complaint must contain "specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity." Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir. 2003); see also Randall, 610 F.3d at 709-10

13

("Pleadings for § 1983 cases involving defendants who are able to assert qualified immunity as a defense shall now be held to comply with the standards described in Iqbal. A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth — legal conclusions must be supported by factual allegations."); Staco v. Miami-Dade Cnty., 536 F. Supp. 2d 1301, 1304 (S.D. Fla. 2008) ("[A] claim can be dismissed where a plaintiff pleads facts or makes admissions that demonstrate that a defense is applicable on the face of the pleadings.")(citing Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1022 (11th Cir. 2001)). Thus, "[i]f a defendant asserts a qualified immunity defense in a Rule 12(b)(6) motion to dismiss, the Court should grant qualified immunity if the plaintiff's complaint fails to allege a violation of a clearly established constitutional or statutory right." Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1300 (11th Cir. 2007) (citing Williams v. Ala. State Univ., 102 F.3d 1179, 1182 (11th Cir. 1997) (per curiam)).

## III. DISCUSSION

Mr. Gibbons has alleged virtually every possible variation of a § 1983 claim, as well as numerous state law claims, against eight named Defendants. At the outset, for the sake of clarity, the Court outlines what it understands those claims to be.[2]

- In Count I, Mr. Gibbons seeks to hold Officer Martin liable for carrying out an unlawful stop and claims all other Defendants were "deliberately indifferent to the need to train Martin that a paper dealer tag, without more, does not authorize a traffic stop" (Am. Compl. ¶¶ 58-63);

- In Count II, Mr. Gibbons seeks to hold Officer Martin liable for falsely arresting him for obstruction and claims all other Defendants "proximately caus[ed] out of deliberate indifference the unlawful stop," and "it was so obvious that an unlawful stop would lead to a false arrest for obstruction, so each supervisor proximately caused the false arrest of Plaintiff for obstruction by deliberate indifference or reckless disregard" (Id. ¶ 93);

- In Count III, Mr. Gibbons seeks to hold Officer Martin liable for the use of *any* force because

---

[2]    It is worth emphasizing at this point that the Amended Complaint was drafted by a lawyer; Mr. Gibbons has at all times been represented by legal counsel. Nevertheless, as Defendants point out, "[i]n many respects, Plaintiff's recent effort is still a shotgun complaint." (Defs.' Br. at 1 n.2.) Mr. Gibbons intersperses new facts throughout the body of the Amended Complaint. Instead of collectively referencing "Defendants" or "Defendant Supervisors" as he did before, Mr. Gibbons simply substitutes a list of *all* those individuals who are "plausibly supervisors" "even though it is also plausible that . . . they did not have that responsibility." (Am. Compl. ¶ 57.) Moreover, despite the Court's instructions to the contrary (Doc. 38 at 8-9), Mr. Gibbons often includes multiple legal theories within a single count, which only becomes clear in brief. Thus, to the extent the Court's interpretation is inconsistent with the intent of Mr. Gibbons' counsel, the Court emphasizes that it is not required "to distill every potential argument that could be made based upon the materials before it." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995); see also Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1296 (11th Cir. 2002) (citations omitted).

"Martin did not have probable cause to arrest Gibbons for obstruction" and claims all other Defendants "are liable . . . , as shown by and incorporated herein . . . , because false arrests will highly foreseeably cause force to be used in effectuating the arrest" (Id. ¶¶ 100, 101);

- In Count IV, Mr. Gibbons alternatively seeks to hold Officer Martin liable for using excessive force if the Court finds there was probable cause to arrest for misdemeanor obstruction and claims all other Defendants "proximately caused due to deliberate indifference the challenged excessive force by failing to train Martin how to appropriately use the taser despite Martin's prior history of excessive taser use" (Id. ¶ 119);

- In Count V, Mr. Gibbons alternatively seeks to hold Officer Martin liable for using excessive force if the Court finds there was probable cause to arrest for felony obstruction and claims all other Defendants "are liable under § 1983 for the deprivation of Gibbons' Fourth Amendment right," incorporating by reference 23 other paragraphs (Id. ¶¶ 120-23);

- In Count VI, Mr. Gibbons seeks to hold Officer Martin liable for retaliating against him in violation of the First Amendment;

- In Count VII, Mr. Gibbons seeks to hold Officer Martin, Officer Jackson, POS Turner, Chief McBride, and John or Jane Doe liable "for causing the obstruction charge, misdemeanor and/or felony, to go to trial, and for a conspiracy to present false evidence during the trial" (Id. ¶ 130);

- In Count VIII, Mr. Gibbons contends that the "conspiracy to prosecute Plaintiff" in Count VII "was also meant to chill protected First Amendment activity to the right to a fair public trial" (Id. ¶ 148);

- In Count IX, Mr. Gibbons only says "the same facts underlying Claim I . . . supports a claim for a deprivation of a First Amendment right of Gibbons' freedom of movement and travel" (Id. ¶ 154);

- In Count X, Mr. Gibbons seeks to hold Officer Martin liable for "unreasonable seizure in violation of ministerial duty" under Georgia law;

- In Count XI, Mr. Gibbons seeks to hold Officer Martin liable for false arrest;

- In Count XII, Mr. Gibbons seeks to hold Officer Martin liable for "abuse during arrest;"

- In Count XIII, Mr. Gibbons seeks to hold Officer Martin liable for "intentionally caus[ing] or attempt[ing] to cause Plaintiff physical injury" pursuant to O.C.G.A. § 51-1-13 and O.C.G.A. § 51-1-14, statutes which define the scope of tort law in Georgia;

- In Count XIV, Mr. Gibbons seeks to hold Officer Martin liable for false imprisonment; and

- In Count XV, Mr. Gibbons states "[t]his claim is against Defendants Martin, McBride, Turner, Jackson, and John or Jane Doe, because they caused a criminal prosecution to be instigated against Plaintiff under process, out of malice to get a wrongful conviction, prevent a future civil suite [sic], and to cover up their own misdoings" (Am. Compl. ¶ 178).

As Defendants summarize in response,

Defendants seek dismissal of all damage claims against any of them in their official capacity. All defendants other than [Officer] Martin seek dismissal of all claims against them in their individual capacity. Defendant Martin seeks dismissal of all claims against him in his individual capacity except for Claims I through V.

(Defs.' Br., Doc. 42-1, at 3 n.4, 23-24.)  Utilizing the motion to dismiss standards articulated in Part II, supra, the Court now addresses the parties' specific arguments in logical fashion.

**A.  Mr. Gibbons Cannot Sustain Any Claims Against Fictitious John or Jane Doe Actors**

"As a general matter, fictitious-party pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010); see also Fitzpatrick v. Ga. Dep't of Corr., No. CV 612-022, 2012 WL 5207474, at *8 (S.D. Ga. Sept. 12, 2012), R&R adopted as modified, No. CV 612-022, 2012 WL 5207472 (S.D. Ga. Oct. 22, 2012).  A limited exception to this rule exists "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage,'" and thus discovery would uncover the unnamed defendant's identity. Richardson, 598 F.3d at 738 (quoting Dean v. Barber, 951 F.2d 1210, 1215-16 (11th Cir. 1992)); Daleo v. Polk Cnty. Sheriff, No. 8:11-CV-2521-T-30 TBM, 2012 WL 1805501, at *4-5 (M.D. Fla. May 17, 2012) (citing Dean, 951 F.2d at 1215-16).

In this case, Mr. Gibbons does not describe John Doe or Jane Doe with any specificity.  In some instances, he merely states that John Doe or Jane Doe is a "supervisor."  (See id. ¶¶ 56, 63, 92, 93, 94, 101, 116, 119, 122.)  In the caption, he identifies John Doe and Jane Doe as "officers."  (See Am. Compl.

at 2.) In other paragraphs of the Amended Complaint, John Doe or Jane Doe were delegated supervisory authority (id. ¶ 57), "caused [Mr. Gibbons'] obstruction charge" (id. ¶ 130), "conspired to cause the malicious prosecution" (id. ¶ 131), conspired with other officers (id. ¶ 146), were aware of certain facts and "engaged in conspiratorial activity" (id. ¶ 150), and "caused a criminal prosecution" (id. ¶ 178). These bare descriptions and conclusory allegations "do[] not equate to the real possibility that these unknown individuals' identities will be revealed" during discovery, and the Court will not enable a fishing expedition on account of Mr. Gibbons' use of placeholders. See Fitzpatrick, 2012 WL 5207474, at *8.

In the very last of forty-four footnotes, which is wholly unrelated to the appended text, Mr. Gibbons responds that "[n]ew Defendants can be brought in at least until the two year statute of limitations has passed, so if new evidence or discovery reveals that an unnamed Defendant participated in the malicious prosecution of Gibbons in 2013, he or she can still be added as a party." (Pl.'s Resp., Doc. 44, at 25 n.44.) Mr. Gibbons' argument is unresponsive to the Eleventh Circuit's clear standards for fictitious-party pleading. Nevertheless, it does reflect Mr. Gibbons' understanding of his right to move to join additional parties at the appropriate time, if any such time remains in this case. Until then, the Court **DISMISSES** all

claims against John Doe and Jane Doe. The Court **DIRECTS** the Clerk, as well as the parties, to terminate them as Defendants in this case.

## B.  Mr. Gibbons Cannot Sustain Any Claims Against Defendants in Their Official Capacities

Defendants argue that the Board of Regents and any of its agents sued in their official capacities are entitled to immunity under the Eleventh Amendment from claims for monetary damages and otherwise are not "persons" for purposes of § 1983. (Defs.' Br. at 3-5.)  Mr. Gibbons failed to respond to Defendants' clearly identified argument on this issue, which indicates that he does not oppose dismissal on these grounds. See LR 7.5, SDGa.

Indeed, in this case, Mr. Gibbons' § 1983 claims against Defendants in their official capacities are barred by the Eleventh Amendment.  The Eleventh Amendment bars suit against a state brought by both citizens of another state and the state's own citizens. McClendon v. Ga. Dep't of Cmty. Health, 261 F.3d 1252, 1256 (11th Cir. 2001).  State agencies, like the Board of Regents of the University System of Georgia, share this Eleventh Amendment immunity.  See Fouche v. Jekyll Island-State Park Auth., 713 F.2d 1518, 1520-23 (11th Cir. 1983); Bd. of Regents of Univ. Sys. of Ga. v. Barnes, 743 S.E.2d 609, 611 (Ga. Ct. App. 2013).  By extension, the Eleventh Amendment also bars

§ 1983 lawsuits against state officials in their official capacities, because in such cases, the state is considered to be the real party in interest. Cross v. State of Ala., 49 F.3d 1490, 1503 (11th Cir. 1995). A defendant need not be labeled a "state officer" or "state official" to receive Eleventh Amendment immunity, but instead need only be acting as an "arm of the State," which includes the state's agents and instrumentalities. Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003) (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30 (1997)). There is no dispute that Chief McBride, the Officer Defendants (Wesley Martin, Zachary Skinner, and Brian Jackson), the Supervisor Defendants (Ernest Black, Jr. and Eugene Maxwell), and POS Turner, in their official roles as members of the GRU Police Bureau, constitute "state officers" or "state agents" entitled to Eleventh Amendment protection.

Moreover, in order to succeed on a § 1983 claim, "a plaintiff must show that he or she was deprived of a federal right *by a person* acting under color of state law." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001) (emphasis added). In Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71 (1989), the Supreme Court held that neither a state nor its officials acting in their official capacities are "persons" under § 1983. Therefore, Mr. Gibbons cannot sue Chief McBride, the Officer Defendants, the Supervisors Defendants, or

POS Turner in their official capacities insofar as he seeks damages, and those claims are due to be **DISMISSED**. The Court **DIRECTS** the parties to amend the caption in all filings going forward.

## C. Mr. Gibbons Failure to Comply with the GTCA Bars His State Law Claims

The GTCA provides for a limited waiver of the State's sovereign immunity. O.C.G.A. § 50-21-23(b) ("The state waives its sovereign immunity only to the extent and in the manner provided in this article . . . ."); see also O.C.G.A. § 50-21-21(a) ("[T]he state shall only be liable in tort actions within the limitations of this article and in accordance with the fair and uniform principles established in this article."). In order to effectuate this waiver, plaintiffs must satisfy certain prerequisites. O.C.G.A. § 50-21-35 provides in pertinent part:

> In all civil actions brought against the state under this article, to perfect service of process the plaintiff must both: (1) cause process to be served upon the chief executive officer of the state government entity involved at his or her usual office address; and (2) cause process to be served upon the director of the Risk Management Division of the Department of Administrative Services at his or her usual office address.

Id. The procedural components of the GTCA, like its other terms, are strictly construed. Green v. Cent. State Hosp., 621

22

S.E.2d 491, 494 (Ga. Ct. App. 2005) (citing Curry v. Ga. Dep't of Corr., 503 S.E.2d 597, 598 (Ga. Ct. App. 1998)).

In this case, Defendants contend Mr. Gibbons did not meet the second requirement: the director of the Risk Management Division of the Department of Administrative Services has not been served at all. (Defs.' Br. at 10 (citing Docs. 7, 8).) Mr. Gibbons' failure to respond to Defendants' clearly identified argument on this point again indicates that he does not oppose dismissal on these grounds.[3],[4] See LR 7.5, SDGa.

Failure to serve the director of the Department of Administrative Services, Risk Management Division precludes compliance with the condition precedent to waiver of sovereign

---

[3] Mr. Gibbons also did not respond to Defendants' argument that he failed to comply with § 50-21-26(a)(4), which mandates that "[a]ny complaint filed pursuant to [the GTCA] *must* have a copy of the notice of claim presented to the Department of Administrative Services together with the certified mail or statutory overnight delivery receipt or receipt for other delivery attached as exhibits." Id. (emphasis added). Failure to cure this defect within thirty days after the State raises the issue "*shall* result in dismissal without prejudice." Id. (emphasis added). Neither Mr. Gibbons' original Complaint (Doc. 1) nor his Amended Complaint (Doc. 40) addresses in any form his compliance with the GTCA's service and notice requirements. Mr. Gibbons had until March 31, 2012 to file the notice of claim and delivery receipt, which he did not do. Accordingly, § 50-21-26(a)(4) provides an independent ground for this Court's **DISMISSAL** of Counts X, XI, XII, XIII, XIV, and XV.

[4] Mr. Gibbons' broad claim, again buried in a footnote, that he "was not required to comply with the notice provisions" of the GTCA because he is suing Defendants "as individuals acting outside of the scope of their official duties and employment" is wrong. (Pl.'s Resp. at 25 n.43.) The GTCA is the exclusive remedy for any tort committed by a state officer or employee. O.C.G.A. § 50-21-25(a). Those officers' or employees' immunity is lost *only* "if it is *proved* that [their] conduct was not within the scope of his or her official duties or employment." Id. (emphasis added). Mr. Gibbons may not sidestep the GTCA's procedural requirements armed with nothing more than mere allegations that Defendants, who engaged in certain conduct *as police officers*, "stepped outside" the scope of their authority. (Pl.'s Resp. at 22-25.) To hold otherwise would defeat the purpose of the GTCA and eviscerate the limited waiver of immunity.

immunity and renders void Mr. Gibbons' action such that the statute of limitations is not tolled.[5] <u>Green</u>, 621 S.E.2d at 493-94; <u>see also</u> <u>Henderson v. Dep't of Transp.</u>, 475 S.E.2d 614, 615 (Ga. 1996); <u>Sylvester v. Dep't of Transp.</u>, 555 S.E.2d 740, 741 (Ga. Ct. App. 2001). Although a plaintiff may cure ineffective service in some instances, the Court **DISMISSES** Counts X, XI, XII, XIII, XIV, and XV of Mr. Gibbons' Amended Complaint.

The statute of limitations expired on Mr. Gibbons' state law claims on March 1, 2014 (Claims X — XIV based on Mr. Gibbons' March 1, 2012 arrest) and July 11, 2015 (Claim XV based on Mr. Gibbons July 11, 2013 acquittal). <u>See</u> O.C.G.A. § 50-21-27(c). When service is accomplished after the statute of limitation expires, as would be the case here, the timely-filed complaint tolls the statute only upon a showing that the

---

[5]    In 2007, the Georgia Supreme Court decided <u>Georgia Pines Cmty. Serv. Bd. v. Summerlin</u>, in which it held, without overruling prior precedent, that "[t]he service of process provision of the Georgia Tort Claims Act is procedural in nature, not jurisdictional." 647 S.E.2d 566, 570 (Ga. 2007). At issue in <u>Georgia Pines</u> was <i>who</i> must be served and <i>how</i> under O.C.G.A. § 50-21-35. More specifically, the Court considered whether a plaintiff must have the summons and complaint <i>handed</i> to the <i>chief executive officer</i> of the state government entity involved and <i>not</i> to an administrative assistant or other agency employee in order to perfect service for GTCA purposes. <u>Georgia Pines</u>, 647 S.E.2d at 568. In the end, the Supreme Court affirmed the Court of Appeals' decision that service on the personnel manager was proper by way of the Civil Practice Act and, in any case, the defendant waived any service of process defense it may have had by its own actions during discovery. <u>Id.</u> at 567, 569. Although the "procedural, not jurisdictional" language in <u>Georgia Pines</u> is appealing, the Court finds it does not apply in a case like this where <i>no</i> service of process occurred on one of the necessary parties. To excuse as a mere procedural technicality Mr. Gibbons' failure to serve process on the director of the Risk Management Division of the Department of Administrative Services, especially where Defendants contested this failure at the first opportunity and consistently thereafter, would render a nullity the GTCA's service of process requirement and limited waiver of sovereign immunity.

plaintiff acted reasonably and diligently in effecting proper service as quickly as possible. Curry v. Georgia Dep't of Corr., 503 S.E.2d 597, 598 (Ga. Ct. App. 1998) (citing Patterson v. Johnson, 486 S.E.2d 660, 661 (Ga. Ct. App. 1997)). Mr. Gibbons became aware of the service defect on July 3, 2014 when Defendants filed their first motion to dismiss (Doc. 12 at 15-16) and received renewed notice on December 1, 2014 (Defs.' Br. at 10). Mr. Gibbons' failure to effect service on the director of the Department of Administrative Services, Risk Management Division, for over a year after filing the complaint, knowing of Defendants' attack on the sufficiency of service of process, precludes him from establishing lack of fault for the delay. See Curry, 503 S.E.2d at 598-99. Thus, without a basis to toll the statute of limitations on his state law claims, granting Mr. Gibbons leave to cure service of process and re-file his state law claims would be futile.

## D. Defendants' 12(b)(6) Challenge to the Federal Counts

### 1. *Counts I through V: Unlawful Stop, False Arrest, and Excessive Force*

All Defendants except Officer Martin seek dismissal of Counts I through V for failure to state a claim upon which relief can be granted.[6] Within these counts, Mr. Gibbons seeks to hold the Board of Regents liable prospectively for "[t]aser

---

[6]    Officer Martin also does not claim entitlement to qualified immunity at this stage. (See Defs.' Br. at 3 n.4, 23-24.)

training and supervision, and officer misconduct supervision, adequate internal investigation and training for the manner in which officers are to respond to persons with paper, or dealer tags, and office retention and termination policies" (Am. Compl. ¶ 16) based on facts scattered over 101 paragraphs.[7] Based on the same facts, Mr. Gibbons also attempts to assert claims against five additional Defendants (Chief McBride, Supervisors Black and Maxwell, POS Turner, and Officer Skinner). It remains unclear — even after the original Complaint's sufficiency was specifically challenged and the qualified immunity defense expressly advanced by opposing counsel — upon what legal theories relief is sought and in what specific manner these five Defendants acted or failed to act. (See Defs.' Br. at 1-3.) Notwithstanding the persistent deficiencies,[8] it is incumbent upon the Court to identify the precise constitutional violation charged and explain what the violation requires before discussing liability in this § 1983 suit. Franklin v. Curry, 738 F.3d 1246, 1250 (11th Cir. 2013) (citing Baker v. McCollan,

---

[7]     Neither party addresses Mr. Gibbons' claims against the Board of Regents, whose name appears only twice in the Amended Complaint. (Am. Compl. ¶¶ 8, 16.)

[8]     The Court advises Mr. Gibbons' counsel to meditate over the Eleventh Circuit's recent decision in Weiland v. Palm Beach Cnty. Sheriff's Office, No. 13-14396, 2015 WL 4098270 (11th Cir. July 8, 2015), especially its discussion of the four sins of shotgun pleading. Armed with Weiland's clear roadmap, 2015 WL 4098270, at *5 & n.10, the Court warns Mr. Gibbons' counsel, for the last time, that these are the standards to which his pleadings will be held in all cases filed with this Court moving forward. See also Pearson v. Augusta, No. CV 114-110, 2015 WL 800206, at *1 n.1 (S.D. Ga. Feb. 24, 2015).

443 U.S. 137, 140 (1979)); Tolbert v. Trammell, No. 2:13-CV-02108-WMA, 2014 WL 3892115, at *2 (N.D. Ala. Aug. 4, 2014).

To narrow down this task, the Court first **DISMISSES** Counts II and III against Chief McBride, Supervisors Black and Maxwell, POS Turner, and Officer Skinner for failure to state a claim. Count II contends Mr. Gibbons' arrest for obstruction lacked probable cause and that "it is obvious that an officer will need to be trained to not make the unlawful stop in the first place in order to avoid a false arrest for perceived obstruction." (Am. Compl. ¶ 89.) Stripping away Mr. Gibbons' conclusory allegations (id. ¶¶ 89, 92, 93, 94), there are no well-pleaded facts to support a supervisory liability claim of any kind against Chief McBride, Supervisors Black and Maxwell, POS Turner, or Officer Skinner related to the obstruction arrest. Moreover, Officer Martin's alleged disagreeable disposition (id. ¶¶ 90, 91) simply is not a matter of constitutional concern.

Count III is based on Mr. Gibbons' assertion that Officer Martin did not have probable cause to make the challenged traffic stop or the arrest for obstruction, and accordingly could not use *any* degree of force. (Am. Compl. ¶ 100.) "Under this Circuit's law[, however,] . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive

force claim." <u>Bashir v. Rockdale Cnty.</u>, 445 F.3d 1323, 1331-32 (11th Cir. 2006) (emphasis and citation omitted). Accordingly, Claim III fails as a matter of law.[9],[10] Moreover, to the extent Mr. Gibbons intends to append a supervisory liability to Count III, it is inadequately pleaded. The sole allegation related to Chief McBride, Supervisors Black and Maxwell, POS Turner, and Officer Skinner is an endless maze of incorporations by reference that lead to the following legal conclusion: these Defendants "are liable under § 1983 for the deprivation of Gibbons' Fourth Amendment right as claimed in ¶ 100," which contends Officer Martin tased Mr. Gibbons without probable cause for arrest, "because false arrests will highly foreseeably cause force to be used in effectuating the arrest." (Am. Compl. ¶ 101.)

That leaves Count I, as well as Counts IV and V, which Mr. Gibbons frames in the alternative to Count III if the Court later finds that Officer Martin made a lawful arrest for either misdemeanor or felony obstruction. As the Court did above,

---

[9]    The Court also **DISMISSES** Count III as asserted against Officer Martin on this same ground.

[10]    "This is not to say that [Mr. Gibbons] cannot recover damages for the force used in his arrest" if the Court later finds the arrest was unlawful. <u>Bashir</u>, 445 F.3d at 1332. "To the contrary, the damages recoverable on an unlawful arrest claim 'include damages suffered because of the use of force in effecting the arrest.'" <u>Id.</u> (citing <u>Williamson v. Mills</u>, 65 F.3d 155,158-59 (11th Cir. 1995) and <u>Motes v. Myers</u>, 810 F.2d 1055, 1059 (11th Cir. 1987)).

stripping away Mr. Gibbons' conclusory allegations, the remaining counts appear to hinge only on the following:

(1) Defendants McBride, Black, and Maxwell, *based on position and rank*, are plausibly supervisors who had the responsibility or had been delegated the responsibility to correct, train, or retrain officers who deprive citizens of constitutional rights, even though it is also plausible that with respect to McBride, Black and Maxwell they did not have that responsibility or delegated it to one of the other Defendants including John or Jane Doe (Am. Compl. ¶ 57 (emphasis added));

(2) Defendant Skinner is plausibly a direct supervisor of Martin based on his signature as Martin's supervisor on a Taser use of force report concerning an incident on 09-09-11, even though it is also plausible that Skinner is not Martin's direct supervisor because John or Jane Doe is his supervisor" (Id. ¶ 57);

(3) Officer Martin stopped Mr. Gibbons in September 2010 solely for having a paper tag and the charges ultimately were dismissed, facts his supervisors "must have known" (Id. ¶¶ 44, 58-62);

(4) During the September 2010 traffic stop, Officers Martin and Skinner cuffed Mr. Gibbons so tightly that his wrists bled (Id. ¶ 36);

(5) Officer Martin was not sanctioned or punished as a result of the September 2010 traffic stop (Id. ¶ 45);

(6) Officer Martin's testimony during Mr. Gibbons' criminal trial on the March 2012 obstruction charge revealed that "GRU officers *regularly* pulled over cars because they had a paper tag, without more, making the citizen produce paper and often charging them with improper registration or no tag" (Id. ¶ 47 (emphasis added));

(7) "Before [Officer] Martin's 2012 stop of Gibbons, none of the Defendant Supervisors . . . trained

or informed Martin that a paper tag without more does not authorize him to conduct a traffic stop" (Id. ¶ 56);

(8) "[B]efore March 1, 2012, Gibbons [sic] had numerous encounters with citizens revealing a tendency to overreact and fail to reasonably communicate with citizens, that Martin caused to escalate to the point where he unlawfully justified his use of force" (Id. ¶ 91);

(9) "Defendant Supervisors . . . knew . . . of [Officer] Martin's tendency to overreact and fail to reasonably communicate, yet failed to take corrective action including either training, transferring or terminating him, as shown by [Officer] Martin's continued employment" (Id. ¶ 94);

(10) "[POS] Turner who had had no training relative to conducting an investigation found nothing wrong with [Officer] Martin's actions during the 2012 stop of Gibbons, despite the several policy violations readily discernible from [Officer] Martin's admissions and the video of the incident" (Id. ¶ 108);

(11) "[POS] Turner incompetently believed [Officer] Martin's story about inadvertently pulling the trigger by failing to compare [Officer] Martin's story to the video of the incident" (Id. ¶ 111);

(12) "[POS] Turner passed on her finding, that [Officer] Martin did nothing wrong in the challenged accident, to the chief of the entire department, Chief McBride, who reviewed it and did not object" (Id. ¶ 114); and

(13) "[u]pon information and belief, [Officer] Martin has prior incidents of use of the taser that is or could be excessive, based on the high frequency of use" (Id. ¶ 115).

Mr. Gibbons does not allege that Chief McBride, Supervisors Black and Maxwell, Officer Skinner, and POS Turner personally

participated in or otherwise ordered the unlawful stop, false arrest, or use of excessive force in March 2012. Thus, from the allegations above and Mr. Gibbons' briefs, the Court understands Mr. Gibbons to claim that these Defendants did nothing by way of training or supervision to ensure that Officer Martin no longer (1) initiated stops solely on the basis of a paper tag or (2) used excessive force — specifically, "excessive tasing" — in carrying out stops or arrests. Because Mr. Gibbons' Fourth Amendment claims are asserted against these Defendants in their capacity as supervisors, the Court will assume — without deciding — that Officer Martin violated Mr. Gibbons' Fourth Amendment rights. See Dalrymple, 334 F.3d at 995 (articulating the methodology for resolving claims of supervisory liability); McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *15 (N.D. Ga. Feb. 16, 2012). "The question then becomes whether [these Defendants'] 'supervisory actions' caused the alleged deprivation of those rights." McDaniel, 2012 WL 526078, at *15 (citing Gonzalez, 325 F.3d at 1234).

   a.   The Legal Standard for Supervisory Liability
        Claims

It is well-established that supervisors are not subject to § 1983 liability under theories of respondeat superior or vicarious liability. Keith v. DeKalb Cnty., Ga., 749 F.3d 1034, 1047 (11th Cir. 2014) (citing Cottone v. Jenne, 326 F.3d 1352,

1360 (11th Cir. 2003)). Instead, supervisors can violate federal law and be held individually liable for the conduct of their subordinates only "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Id. (quoting Cottone, 326 F.3d at 1360) (internal quotation marks omitted). A plaintiff can establish a causal connection by alleging that: (1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. Williams v. Santana, 340 F. App'x 614, 617 (11th Cir. 2009) (citing Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007)); see also Easley v. Macon Police Dep't, No. 5:12-CV-148 MTT, 2013 WL 5592514, at *2 (M.D. Ga. Oct. 10, 2013). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Santana, 340 F. App'x at 617 (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). "In

32

short, the standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." Keith, 749 F.3d at 1048 (citation and internal quotation marks omitted).

Mr. Gibbons' claims for relief in Counts I and Counts IV/V — that Chief McBride, Supervisors Black and Maxwell, Officer Skinner, and POS Turner failed to adequately train or supervise Officer Martin — implicates a different, albeit very similar, rule: "under § 1983, a supervisor can be held liable for failing to train his or her employees only where the failure to train amounts to deliberate indifference to the rights of persons with whom the officers come into contact." Keith, 749 F.3d at 1052 (alteration, citation, and internal quotation marks omitted). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, . . . such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, . . . and when the failure to train is likely to result in the violation of a constitutional right." McDaniel, 2012 WL 526078, at *16 (quoting Belcher v. City of Foley, 30 F.3d 1390, 1397-98 (11th Cir. 1994)). "Thus, a plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training

program causes [his or her] employees to violate citizens'
constitutional rights,' and that armed with that knowledge the
supervisor chose to retain that training program." Keith, 749
F.3d at 1052 (quoting Connick v. Thompson, 131 S. Ct. 1350, 1360
(2011)).

      b.   Analysis

As a preliminary matter, the Court **DISMISSES** Mr. Gibbons'
supervisory liability claims against Supervisors Black and
Maxwell, Officer Skinner, and POS Turner. With respect to
Supervisors Black and Maxwell and Officer Skinner, Mr. Gibbons
essentially alleges that because of their titles, they "*must
have known*" about the (1) "regular practice" of stopping
vehicles based on paper tags, (2) internal affairs complaints
filed against Officer Martin, and (3) dismissal of Mr. Gibbons'
citation in 2010. (Am. Compl. ¶¶ 59-61 (emphasis added).) The
only allegations in relation to Officer Martin's use of
excessive force that involve these Defendants are wholly
conclusory. (See Am. Compl. ¶ 116 ("Defendant
supervisors . . . are liable under § 1983 for the deprivation of
Gibbons' Fourth Amendment right as claimed in ¶ 113."); ¶ 119
("Defendant supervisors . . . proximately caused due to
deliberate indifference the challenged excessive force by
failing to train Martin how to appropriately use the taser

despite Martin's prior history of excessive taser use."); ¶ 122 ("Defendant supervisors . . . are liable under § 1983 for the deprivation of Gibbons' Fourth Amendment right as claimed in ¶ 121).)

Simply, Mr. Gibbons "alleges nothing about the significance of [these Defendants'] titles, their individual roles . . . , their personal interactions or familiarity with [Officer Martin], their length of service, their management policies, or any other characteristics that would bear on whether they knew about [or] were deliberately indifferent to [Officer Martin's] conduct and the risk he posed." See Franklin, 738 F.3d at 1251-52. Indeed, the manner in which Mr. Gibbons first identifies these individuals as "supervisors" reflects that he simply does not know any details about their responsibilities. (See Am. Compl. ¶ 57 ("Defendants . . . Black[] and Maxwell, based on position and rank . . . are plausibly supervisors . . . [,] even though it is also plausible that . . . they did not have that responsibility . . . . Defendant Skinner is plausibly a direct supervisor of Martin based on his signature . . . [,] even though it is also plausible that Skinner is not Martin's direct supervisor.").) "Far from excusing [his] insufficient pleadings, this admission only reinforces [the Court's] conclusion" that Mr. Gibbons' claims against them are due to be dismissed, as there are no individualized allegations from which

the Court could infer their subjective awareness of the risk of harm that Officer Martin purportedly posed and that each of them exhibited deliberate indifference through *his own actions* sufficient to state a claim. Franklin, 738 F.3d at 1252 n.6; Keating v. City of Miami, 598 F.3d 753, 763 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 676).

Unlike Supervisors Black and Maxwell and Officer Skinner, Mr. Gibbons' does *not* allege outright that POS Turner was a supervisor. Rather, Mr. Gibbons asserts that Chief McBride appointed POS Turner to undertake the internal affairs investigation of Officer Martin's conduct in 2010 and 2012, POS Turner had no training respective to internal investigations, and that Chief McBride previously selected a parking attendant to carry out such work. (Am. Compl. ¶¶ 39-41, 108, 111.) The only other relevant, non-conclusory allegations are that POS Turner passed on her findings to Chief McBride and Chief McBride ratified those findings. (Id. ¶¶ 44, 114, 118.) Thus, based on the fact that POS Turner investigated Officer Martin, Mr. Gibbons contends POS Turner "was deliberately indifferent to the need to train Martin, or cause Martin to be trained by the appropriate supervisor, that a paper dealer tag, without more, does not authorize a traffic stop" and "proximately caused due to deliberate indifference the challenged excessive force by

failing to train Martin how to appropriately use the taser . . . ." (Id. ¶¶ 62, 119.)

The Court likewise finds these allegations insufficient to state a claim. Not only does Mr. Gibbons fail to allege that POS Turner is a supervisor of Officer Martin, there are no other facts from which the Court could infer that POS Turner is in the GRU Police Bureau chain of command or had any authority to institute corrective measures or make recommendations with respect to Officer Martin's behavior beyond passively reporting the results of her investigation to Chief McBride. The claims for supervisory liability against POS Turner, therefore, are also **DISMISSED**.

The Court now turns to the last man standing, Chief McBride, and whether the Amended Complaint sufficiently alleges a causal connection between Chief McBride's failure to supervise or train and the purported constitutional violations carried out by Officer Martin in March 2012. Viewing the facts in the light most favorable to Mr. Gibbons — as the Court must do — the Court examines the Amended Complaint to determine what allegations, if any, address Chief McBride's (1) knowledge of Officer Martin's allegedly unlawful practices at the point of his misconduct in March 2012 and (2) actions that raise an inference of indifference.

With respect to Mr. Gibbons' failure to train claim surrounding the traffic stop, the Amended Complaint reflects that Officer Martin pulled Mr. Gibbons over twice, *solely* on account of his paper dealer tag, over the course of approximately eighteen months. Chief McBride knew that Officer Martin had done so as a result of an investigation into the 2010 stop, carried out by POS Turner at the *direction of Chief McBride* and ultimately *approved by Chief McBride*. Officer Martin also explained that GRU officers *regularly* pulled over cars solely because they had a paper tag. Chief McBride then purposefully selected an incompetent investigator in 2010 so as to clear Officer Martin of any wrongdoing. Lastly, despite the dismissal of Mr. Gibbons' 2010 charges post investigation, a nearly identical unlawful stop in 2012, Mr. Gibbons' renewed internal complaint with the GRU Police Bureau, and Mr. Gibbons' subsequent acquittal on charges stemming from the 2012 stop, Chief McBride retained Officer Martin on the force.

Similarly, with respect Mr. Gibbons' failure to train claim surrounding Officer Martin's use of excessive force, the Amended Complaint reflects that Officer Martin was involved in two incidents of force during traffic stops over the course of approximately eighteen months: Mr. Gibbons was cuffed too tightly by Officers Martin and Skinner in September 2010 and Officer Martin tased Mr. Gibbons five times in March 2012.

Chief McBride knew the September 2010 stop resulted in severe cuffing because of the previously-described internal affairs complaint filed by Mr. Gibbons and investigation carried out at Chief McBride's direction. Mr. Gibbons further alleges that before March 2012 Officer Martin had "numerous encounters with citizens revealing a tendency to overreact . . . that Martin caused to escalate to the point where he unlawfully justified his use of force," and he used his taser with alarmingly "high frequency," statistics about which were reported (Doc. 19 at 11 n.8). As in 2010, Chief McBride purposefully selected an incompetent investigator in 2012, whose results Chief McBride ratified, resulting in zero discipline.

Mr. Gibbons has not adequately alleged that there was a history of *widespread* prior abuse, as defined in Brown, 906 F.2d at 671, that put Chief McBride on notice of the need for improved training or supervision. The question is, therefore, whether Chief McBride's failure to train or supervise Officer Martin when faced with (1) a significant, but single concrete complaint about an unlawful stop carried out by Officer Martin during which Mr. Gibbons was cuffed to the point of bleeding; (2) testimony that suggests GRU Police Bureau officers had a "regular" practice of stopping citizens for paper tags during

the relevant time period;[11] (3) Officer Martin's high frequency of taser use; and (4) and Officer Martin's "numerous" escalated confrontations with the public constitute a pattern of behavior as to which Chief McBride showed deliberate indifference.

The Court concludes that Mr. Gibbons' allegations are narrowly sufficient to survive a motion to dismiss. This is the rare case in which the *same* conduct recurred between the *same* citizen and the *same* law enforcement officer, which was investigated by the *same* individual at the direction of the *same* superior, and this recurrence allegedly resulted in the violation of constitutional rights. Accepting the foregoing allegations as true, a reasonable jury could infer that Chief McBride — as the head of the department, initiator of the investigation into Mr. Gibbons' *specific* internal complaint in September 2010, and ultimate decision maker with respect to approval of the resulting investigative report and the department's response thereto — knew or should have been aware of Officer Martin's and other deputies' stops for paper tags (Count I), as well as Officer Martin's use of unreasonable force (Counts IV/V). See, e.g., Gonzalez v. Israel, No. 15-CIV-60060,

---

[11]    The Court recognizes that Officer Martin's testimony about this practice is temporally problematic; it was elicited during Mr. Gibbons' July 2013 criminal trial for obstruction, more than 15 months *after* the traffic stop during which Mr. Gibbons was tased. Although the testimony itself could not have put Chief McBride on notice of Officer Martin's unlawful practices in time to prevent the March 2012 stop, from the *substance* of the testimony, as alleged, a jury could infer that the practice was systematic and ongoing at the time of and before the March 2012 stop, and Chief McBride, therefore, knew or should have known about it.

2015 WL 1143116, at *14 (S.D. Fla. Mar. 13, 2015) (finding the plaintiff's allegations — a "string of facts to effect that [the officer] was unqualified for his position" and that the officer previously engaged in activity identical to that complained of by the plaintiff — sufficient to survive a motion to dismiss on his municipal liability claim for failure to train or supervise); Hooks v. Rich, No. CV 605-065, 2006 WL 565909, at *4 n.6 (S.D. Ga. Mar. 7, 2006) (noting, in the § 1983 context, that "[r]epeated abuse by a single officer may be sufficient to constitute a pattern of abuse" (citing Beck v. City of Pittsburgh, 89 F.3d 966, 972-73 (3d Cir. 1996) (finding prior complaints about an officer involving violent behavior in arresting citizens identical to those at issue were sufficient for the jury to infer that municipality had knowledge of that officer's propensity for misbehavior and could support the conclusion that municipality had a pattern of tacitly approving the use of excessive force))); Wilson ex rel. Estate of Wilson v. Miami-Dade Cnty., No. 04-23250-CIV, 2005 WL 3597737, at *4 (S.D. Fla. Sept. 19, 2005) (denying county's motion to dismiss where the plaintiff alleged that it was aware of other incidents of similar conduct by an individual employee that supported a theory that there was a failure to supervise that employee); see also Geist v. Ammary, No. CV 11-07532, 2012 WL 6762010, at *7 (E.D. Pa. Dec. 20, 2012) (finding § 1983 claims based on

failure to train and deliberate indifference, sufficiently pleaded where the plaintiff alleged that the city provided a particular officer a taser despite inadequate training and with actual notice that the officer had used excessive force in the past). Cf. Sigler v. Bradshaw, No. 13-80783-CIV, 2015 WL 1044175, at *3 (S.D. Fla. Mar. 10, 2015) (dismissing the plaintiff's claim that state agency violated her constitutional rights by failing to properly train one specific investigator because she failed to allege any other misconduct apart from her own situation; such an "isolated occurrence" did not put the agency on notice of an omission in its training program); Owens v. City of Fort Lauderdale, 174 F. Supp. 2d 1282, 1297 (S.D. Fla. 2001) (granting the city's motion for summary judgment on the plaintiffs' claim that it was deliberately indifferent by way of a failure to train on the use of chokeholds because plaintiffs presented only two similar, unsubstantiated previous incidents, thereby failing to present the kind of pattern or series of violations which would place the city on notice that its training program was inadequate); Dowdell v. Chapman, 930 F. Supp. 533, 546 (M.D. Ala. 1996)("[A] single and isolated occurrence . . . cannot be the basis of a viable action predicated on § 1983 because such an unusual occurrence does not rise to the level of 'deliberate indifference' necessary to

succeed on a claim for failure to adequately train police officers.").

These findings, however, do not end the Court's inquiry, as Chief McBride argues that he is entitled to qualified immunity. Although Chief McBride's failure to train or supervise, as alleged, could constitute a constitutional violation, the Court must still evaluate (1) whether his challenged acts or omissions were within his discretionary authority and (2) whether such a violation was clearly established at the time. Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000).

i. *Whether Chief McBride Acted Within His Discretionary Authority*

"A government official proves that he acted within the purview of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" Hutton v. Strickland, 919 F.2d 1531, 1537 (11th Cir. 1990) (quoting Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)); Hudgins v. City of Ashburn, Ga., 890 F.2d 396, 404 (11th Cir. 1989)); see also Hatcher ex rel. Hatcher v. Fusco, 570 F. App'x 874, 877 n.3 (11th Cir. 2014) ("In the qualified immunity context, a government official acts within the scope of [his] discretionary authority when [he] pursues a job-related goal through means that are within [his]

power to utilize." (citing <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265-66 (11th Cir. 2004))); <u>O'Rourke v. Hayes</u>, 378 F.3d 1201, 1205 (11th Cir. 2004) (explaining the discretionary authority inquiry looks to whether defendant's activity "is a part of his job-related powers and responsibilities"); <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004) ("To determine whether an official was engaged in a discretionary function, we consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities.").

Here, Mr. Gibbons specifically alleges that Chief McBride was acting under color of state law in his capacity as the Chief of Police for the GRU Police Bureau and Director of Public Safety at all times relevant to the claims asserted against him. (<u>See</u> Am. Compl. ¶ 7.) As Defendants point out, "[s]upervising a subordinate officer, assigning an investigator to investigate a citizen complaint, investigating a citizen complaint . . . , implementing a policy . . . , and training officers . . . are all job related functions" that Chief McBride carried out only *as a result* of his employment with and authority within the GRU Police Bureau. (Defs.' Reply, Doc. 48, at 7-8.) Accordingly, the first prong of the qualified immunity inquiry is satisfied. <u>See, e.g.</u>, <u>Daniels v. City of Hartford, Ala.</u>, 645 F. Supp. 2d 1036, 1057 (M.D. Ala. 2009) (noting "courts have uniformly held

that supervision of a jail and training of corrections of officers [sic] is an activity within the discretionary authority" of sheriffs); Btesh v. City of Maitland, Fla., No. 6:10-cv-71-ORL-19DAB, 2011 WL 3269647, at *37 n.34 (M.D. Fla. 2011) (finding police chief's "alleged failure to train and supervise police officers is a matter within his discretionary authority"), aff'd sub nom., 471 F. App'x 883 (11th Cir. 2012); Herrick v. Carroll Cnty., No. 1:09-CV-0161-JEC, 2009 WL 3094843, at *9 (N.D. Ga. 2009) ("There is no question that Sheriff Langley was acting within his discretionary authority in training and supervising his subordinates . . . .").

ii. *Whether Chief McBride's Actions Violated Clearly Established Constitutional Law*

The Supreme Court has emphasized that "determining whether a constitutional right was clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Vinyard, 311 F.3d at 1349 (quoting Saucier, 533 U.S. at 201). The relevant, dispositive inquiry is "whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted," Saucier, 533 U.S. at 202 (emphasis added), and "whether the state of the law . . . gave [the officer] 'fair warning' that his conduct deprived his victim of a constitutional right," Hope, 536 U.S. at 740. See also Oliver v. Fiorino, 586 F.3d

898, 907 (11th Cir. 2009) (framing the "clearly established" inquiry as whether it would be "sufficiently clear that a reasonable officer would understand that what he is doing violates [a Constitutional] right") (citations and internal quotation marks omitted). In most cases, fact-specific precedents are necessary to give an officer fair warning of the applicable law. See Jay v. Hendershott, 579 F. App'x 948, 951 (11th Cir. 2014) (describing the two methods used by the Eleventh Circuit to evaluate whether a reasonable officer would know that his conduct is unconstitutional); Oliver, 586 F.3d at 907 ("We have said many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'" (quoting Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000) and Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997))). A plaintiff may also meet his burden by showing (1) "that a broader, clearly established principle should control the novel facts in this situation" or (2) "this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary." Keating, 598 F.3d at 766 (quoting Mercado v. City of Orlando, Fla., 407 F.3d 1152, 1159 (11th Cir. 2005)).

"Furthermore, the [C]ourt cannot consider just any case law to decide if a right was clearly established. Only binding

opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis." Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015) (citing McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007)); see also Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc) (citing Wilson v. Layne, 526 U.S. 603, 616-17 (1999)) (explaining that a "consensus . . . of persuasive authority" from courts in other jurisdictions "would [not] be able to establish the law clearly"), abrogated on other grounds, Twombly, 550 U.S. 544.

The salient question for this case, therefore, is whether the state of the law on March 1, 2012 gave Chief McBride fair warning that his conduct was unconstitutional. There is no question that at time of the incident at issue the law regarding supervisory liability was clearly established. Cottone, 326 F.3d at 1360; Belcher, 30 F.3d at 1397-98. But in order to meet his burden, Mr. Gibbons must point to some factually analogous case or other statement of positive law demonstrating that failure to train or supervise his officers *in the challenged manners* — (1) whether or when a paper tag may warrant a stop and (2) the use of a taser without warning on a suspect that is resisting arrest, albeit "passively" as alleged — violate the Fourth Amendment. See, e.g., Battiste v. Sheriff of Broward

Cnty., 261 F. App'x 199, 202-03 (11th Cir. 2008) (finding, at the motion to dismiss stage, that the police chief was entitled to qualified immunity for failure to train because, "faced with past unjustified arrests by *his* department at public protests," he did not have fair notice that he must train "borrowed" law enforcement officers from other jurisdictions to arrest only upon probable cause) (emphasis added); Gray, 458 F.3d at 1309 (finding the sheriff's failure to provide *specific* training regarding the detention of students, in addition to general training regarding use of force during detention and arrest, was not clearly established for purposes of qualified immunity); Riley v. Newton, 94 F.3d 632, 637 (11th Cir. 1996)(finding the sheriff was entitled to qualified immunity for failure to train where the plaintiffs failed to cite case law or a constitutional provision requiring the sheriff to provide training on how to use Army personnel and rejecting plaintiffs' argument that the City of Canton v. Harris, 489 U.S. 378 (1989), general standard of liability in failure to train cases clearly established the right).

First, in context of the supervisory claim arising out of the purportedly unlawful stop, Mr. Gibbons contends that Chief McBride had fair notice that he must "train or inform his officers that paper tags without more does not authorize a traffic stop." (Pl.'s Resp. at 4.) In support of this

argument, Mr. Gibbons cites <u>Bius v. State</u>, 563 S.E.2d 527, 530 (Ga. Ct. App. 2002) (en banc), in which the Georgia Court of Appeals relied on its prior applications[12] of the principles espoused in <u>Delaware v. Prouse</u>, 440 U.S. 648 (1979), to hold that "stopping a car with a drive-out tag solely to ascertain whether the driver was complying with our vehicle registration laws is . . . not authorized," expressly overruling prior precedent to the contrary. (Pl.'s Resp. at 3 n.9; Pl.'s Sur-Reply, Doc. 50, at 3-7.) In essence, Mr. Gibbons asserts Officer Martin's initial traffic stop was in violation of clearly established law that, "except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." (<u>See</u> Pl.'s Sur-Reply at 5.) <u>Prouse</u>, 440 U.S. at 663. From Mr. Gibbons' argument, it follows that given this longstanding precedent, Chief McBride was required to train his officers that (1) a stop must be justified by specific and articulable facts suggesting the

---

[12]    <u>See</u> <u>Berry v. State</u>, 547 S.E.2d 664, 668 (Ga. Ct. App 2001)(en banc); <u>Vansant v. State</u>, 443 S.E.2d 474, 476 (Ga. Ct. App. 1994).

particular person stopped has committed a violation of the law and (2) the mere fact of *having* a paper tag does not warrant such an intrusion. (*See* Pl.'s Resp. at 3-4 ("Taking as true that there is a regular practice of unconstitutionally stopping cars solely based on paper tags makes plausible . . . that Defendant McBride is liable for a policy or custom of omitting to train or inform officers that paper tags without more does not authorize a traffic stop.").)

Mr. Gibbons further identifies a consensus of persuasive authority, including one case from a sister court within this circuit, <u>United States v. Wright</u>, No. 3:06-CR-447-MCR, 2006 WL 3483503, at *4 (N.D. Fla. Nov. 30, 2006), that indicates a reasonable officer could not have believed his actions were lawful under the circumstances presented here. (<u>See</u> Pl.'s Sur-Reply at 6 n.5 (listing cases).) <u>See also</u> <u>United States v. Brown</u>, No. CR 105-124, 2006 WL 717152, at *4-5 & n.8 (S.D. Ga. Mar. 15, 2006) (finding deputy was justified in conducting a stop to investigate whether the defendant was operating his vehicle in conformance with Georgia's vehicle registration laws because his homemade cardboard tag, taped to the inside of the rear windshield, bore none of the required information and explaining that, although "[a]n officer's 'mere hunch' that a driver and owner of a car with a drive-out tag might not be operating a car in compliance with the vehicle registration laws

does not provide a particularized and objective basis for suspecting criminal activity," Bius "re-affirmed that an officer's suspicion about the *appearance* of a drive-out tag," the tag's visibility, or the absence of a tag *could* authorize an investigatory stop)(emphasis added)(citations omitted).

Defendants' sole response is that decisions issued by the Georgia Court of Appeals cannot clearly establish the law for purposes of qualified immunity under Marsh, 268 F.3d at 1032 n.10. Indeed, the rule in this circuit limits the relevant universe of cases for qualified immunity purposes to *binding* precedent. Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011)(en banc). In light of the Supreme Court's decision in Prouse, however, the Court finds that at this stage of the litigation, Mr. Gibbons has alleged a constitutional violation that was clearly established at the time it occurred.

Exact factual identity with a previously decided case is not required so long as the unlawfulness of the conduct is apparent from the pre-existing law. Coffin, 642 F.3d at 1013 (citation omitted). Distilled from Prouse is the principal that a random stop of a motorist — in the absence of observations of traffic or equipment violations or suspicious activity — violates the Fourth Amendment. 440 U.S. at 650-51. Clearly established law required Chief McBride to train his officers on this principle, which — if not followed or understood — would

likely result in Fourth Amendment violations. Although these are general legal rules, they clearly apply to the facts alleged in the Amended Complaint. (See, e.g., Am. Compl. ¶¶ 50, 52, 54.) Murdock v. Cobb Cnty., Ga., No. 1:12-CV-01743-RWS, 2013 WL 2155465, at *9 (N.D. Ga. May 17, 2013), reconsideration denied, No. 1:12-CV-01743-RWS, 2013 WL 4501456 (N.D. Ga. Aug. 22, 2013). Accordingly, the Court cannot rule that Chief McBride is entitled to qualified immunity from Mr. Gibbons' § 1983 failure to train or supervise claim arising out of Count I. Defendants' motion to dismiss this claim, therefore, is **DENIED**.

Second, in context of the supervisory claim arising out of Officer Martin's use of excessive force, the Eleventh Circuit has "previously noted that 'generally no bright line exists for identifying when force is excessive.'" Jay, 579 F. App'x at 951 (quoting Priester, 208 F.3d at 926). "Therefore, 'unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.'" Id. (quoting Priester, 208 F.3d at 926). Mr. Gibbons, however, has not presented any argument in response to Chief McBride's claim that he is immune in his supervisory capacity (Defs.' Br. at 7 n.7, 23-24), nor has he cited any specific law which Chief McBride's inaction with respect to Officer Martin's alleged use of excessive force might have violated. Instead, Mr. Gibbons argues that because "Defendants'

qualified immunity assertion is plead in the alternative and without any discussion supporting their position that the law was not clearly established, Plaintiff cannot be faulted, at least at this point, for offering a general response, and should be given an opportunity to respond to specific assertions that the law was not clear." (Pl.'s Resp. at 19-21, 21.) He further states that "Defendants have not responded to any of the case law Plaintiff has offered to demonstrate clearly established law, except for law concerning traffic stop, *leaving excessive force not argued.*" (Pl.'s Sur-Reply at 3 n.2 (emphasis added).)

Mr. Gibbons has fundamentally confused the burdens at hand. It is his duty to come forward with argument that qualified immunity is not appropriate with respect to Officer Martin's taser use, which he has not done. Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007) ("First, the *plaintiff* must establish that the defendant's conduct violated a statutory or constitutional right. Next, the *plaintiff* must show that the violation was clearly established.")(emphasis added)(citation and internal quotation marks omitted). Chief McBride, therefore, is entitled to qualified immunity from § 1983 liability for failure to train or supervise related to Counts IV/V, and Defendants' motion to dismiss this claim, therefore, is **GRANTED**.

## 2. Count VI – *First Amendment Retaliation Against Officer Martin*

In Count VI, Mr. Gibbons claims Officer Martin violated his rights under the First Amendment. (<u>See</u> Am. Compl. ¶¶ 124-28.) More specifically, Mr. Gibbons contends his arrest for obstruction, carried out by Officer Martin, was pretextual and undertaken with improper and retaliatory motives that adversely affected Mr. Gibbons' protected speech — namely, (1) Mr. Gibbons' September 2010 internal affairs complaint against Officer Martin and (2) Mr. Gibbons' emergency telephone call to complain about the stop immediately before and during the course of the March 2012 arrest. (<u>Id.</u>)

To survive a motion to dismiss based on retaliation for exercising rights under the First Amendment, Mr. Gibbons must allege facts establishing (1) "his speech or act was constitutionally protected;" (2) he "suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech," and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." <u>Castle v. Appalachian Tech. Coll.</u>, 631 F.3d 1194, 1197 (11th Cir. 2011); <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250 (11th Cir. 2005). Defendants argue that Mr. Gibbons does not state a claim for First Amendment retaliation because he "failed to sufficiently allege that he engaged in protected speech . . . or

that there was a causal connection between any instance of speech and his arrest and [Officer] Martin's use of force." (Defs.' Br. at 21-22.) The Court thus addresses only prongs one and three of the prima facie case.

The First Amendment affords the broadest protection to political expression, but also to the general rights of speech and to petition for redress. Abella v. Simon, 522 F. App'x 872, 874 (11th Cir. 2013) (citing U.S. CONST. amend. I; McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346 (1995); United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967)). It likewise "protects a significant amount of verbal criticism and challenge directed at police officers. . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Skop, 485 F.3d at 1139 (quoting Houston v. Hill, 482 U.S. 451, 461-63, (1987)). At bottom, Mr. Gibbons alleges he engaged in protected activity by reporting police misconduct. (See Am. Compl. ¶¶ 38, 124-26; see also Pl.'s Resp. at 11-13.)

Defendants respond that Mr. Gibbons "never alleges any factual specifics about the nature of the [internal affairs] complaint." (Defs.' Br. at 22.) This argument is unavailing, especially given the very complaint at issue is likely in

Defendants' possession. Moreover, Defendants abandoned any challenge to the classification of Mr. Gibbons' emergency phone call as "protected speech" when they failed to address it in their reply brief. Thus, the Court finds that Mr. Gibbons has alleged sufficient facts as to the first prong to withstand the motion to dismiss. See Abella, 522 F. App'x at 874 (finding the plaintiff alleged facts sufficient to establish three police officers unlawfully retaliated after he filed grievances against each of them and engaged in other protected activity); see also, e.g., Moral v. Hagen, No. 10-2595-KHV, 2011 WL 2746833, at *5 (D. Kan. July 14, 2011) (recognizing as sufficient the plaintiff's allegations that by obtaining an arrest warrant in retaliation for the filing of a complaint against an officer of the Kansas Bureau of Investigation with the internal affairs division, defendant violated her First Amendment rights to free speech and to petition the government); Doe v. Cnty. of San Mateo, No. 07-05596 SI, 2009 WL 735149, at *6 (N.D. Cal. Mar. 19, 2009) (finding the plaintiff stated a claim against two police officers when she alleged they retaliated against her for filing a police report about police misconduct by threatening to arrest her and by stalking, intimidating, and threatening her); McCann v. Winslow Twp., 2007 WL 4556964 *5 n.5 (D.N.J. Dec. 20, 2007) ("[T]he formal mechanism of filing a grievance with a municipal police department is within the realm of activity

clothed in constitutional protection from retaliation.") (citing
Foraker v. Chaffinch, 501 F.3d 231, 236 (3d Cir. 2007),
abrogated on other grounds by Borough of Duryea, Pa. v.
Guarnieri, 131 S. Ct. 2488 (2011)). But see Doe, 2009 WL
735149, at *5-6 (noting the absence of the authority for the
proposition that a statement made to police *during an arrest or
a temporary detention* qualifies as a "petition for redress of
grievances" within the meaning of the First Amendment (citing
Foraker, 501 F.3d at 236, for the proposition that activity
protected from retaliation is characterized by "*formal
mechanism[s] such as the filing of a lawsuit or
grievance*"(emphasis added))).

To establish a causal connection, Mr. Gibbons must allege
that his protected conduct was a "motivating factor" behind
Officer Martin's alleged misconduct. Smith v. Florida Dep't of
Corr., 713 F.3d 1059, 1063 (11th Cir. 2013); Smith v. Mosley,
532 F.3d 1270, 1278 (11th Cir. 2008). "Plaintiff must identify
a sequence of events from which a retaliatory motive can be
inferred, notwithstanding other non-retaliatory motives the
defendant may harbor." Eisenberg v. City of Miami Beach, 1 F.
Supp. 3d 1327, 1344 (S.D. Fla. Mar. 3, 2014) (citation and
internal quotation marks omitted). To resolve the subjective
motivation issue, courts rely on the burden-shifting formula set
forth in Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429

U.S. 274 (1977). <u>Mosley</u>, 532 F.3d at 1278. Under the <u>Mt.</u>
<u>Healthy</u> formula,

> [o]nce the plaintiff has met his burden of
> establishing that his protected conduct was a
> motivating factor behind any harm, the burden of
> production shifts to the defendant. If the defendant
> can show that he would have taken the same action in
> the absence of the protected activity, he is entitled
> to prevail . . . on summary judgment.

<u>Mosley</u>, 532 F.3d at 1278 (quoting <u>Thaddeus-X v. Blatter</u>, 175
F.3d 378, 399 (6th Cir. 1999)).

In conjunction with the burden-shifting formula, courts
also consider the temporal proximity between a plaintiff's
exercise of free speech and the adverse effect in gauging a
causal connection. See <u>Bumpus v. Watts</u>, 448 F. App'x 3, 7 (11th
Cir. 2011) (finding the district court erred by prematurely
dismissing inmate's First Amendment retaliation claim because
inmate sufficiently alleged causation "given the short amount of
time between his appeal of the disciplinary decision and the
alleged retaliatory actions"); <u>Akins v. Fulton Cnty., Ga.</u>, 420
F.3d 1293, 1305 (11th Cir. 2005) (finding the "close temporal
proximity" between a special meeting at which former employees
in county's purchasing department complained to the commissioner
of perceived irregularities in the county's bidding process and
adverse employment actions taken against the same employees by
their supervisor was sufficient to permit reasonable jury to
conclude that incidents were causally connected); <u>Lozman v. City</u>

of Riviera Beach, No. 08-CIV-80134, 2014 WL 4101514 (S.D. Fla. Aug. 19, 2014) (finding adequate circumstantial evidence of causation because there was "a very close temporal connection" between the timing of the plaintiff's expressive speech — public criticism of the integrity of various municipal officials and formal lawsuit — and the city's exertion of an extended string of legal pressures against the plaintiff); Smith v. Bell, No. 06-60750, 2008 WL 868253, at *2 (S.D. Fla. Mar. 31, 2008) (stating "there can be no assumption that eighteen months after a police officer is called names by an arrestee, that the officer's alleged false testimony at a trial where a defendant is partially acquitted meets the casual connection requirement" and concluding "[t]here must be a greater temporal proximity or other evidence of a causal connection to link the protected conduct occurring [eighteen] months prior to the adverse action, as would be the case is most retaliation type analyses" (citing Davis v. Coca-Cola Bottling Co., 516 F.3d 955, 978 (11th Cir. 2008) and Brungart v. Bellsouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000))).

The burden-shifting analysis, however, is not appropriate at the motion to dismiss phase. Johnson v. Conway, No. 1:13-CV-0524-RWS, 2013 WL 5493380, at *4 n.3 (N.D. Ga. Sept. 30, 2013), reconsideration denied, No. 1:13-CV-0524-RWS, 2014 WL 1767710 (N.D. Ga. May 2, 2014); see also generally Mosley, 532

F.3d 1270 (decided on summary judgment); Lozman, 39 F. Supp. 3d 1392 (same). "A determination as to whether a defendant would have taken the same action in the absence of the protected activity is premature when the parties have not conducted discovery." Eisenberg, 2014 WL 821282, at 1344 (citing Conway, 2013 WL 5493380, at *4 n.3). As a result, the Court addresses only whether Mr. Gibbons has met his burden in alleging his protected conduct was a motivating factor and not whether Officer Martin has would have taken the same actions absent Mr. Gibbons' protected conduct.

It is clear from the Amended Complaint that Mr. Gibbons alleges his 2012 arrest by Officer Martin *was the result* of filing a complaint against Officer Martin in September 2010 and raising alarm about Officer Martin's subsequent stop in March 2012.[13] (Am. Compl. ¶ 124.) Although almost *no* temporal gap exists between Mr. Gibbons' emergency telephone call and his March 2012 arrest, as Defendants observe, a *substantial* temporal gap exists between Mr. Gibbons' internal affairs complaint — filed in September 2010 — and the March 2012 arrest. (Defs.' Br. at 22-23). Facially, the latter exercise of Mr. Gibbons'

---

[13] Mr. Gibbons makes no allegation that Officer Martin recognized him or his vehicle before initiating the purportedly unlawful traffic stop. (See Am. Compl. ¶ 67 ("When Martin could see Gibbons through the window, Martin knew that it was Gibbons, or within a few seconds of being at the window, before the tasering, when Martin heard Gibbons on the phone complaining about how GRU police have done this to him before, Martin knew it was Gibbons from the 2010 stop[.]").)

First Amendment rights is exceedingly attenuated from the adverse action taken by Officer Martin. Cf. Bennett, 423 F.3d at 1254 ("The alleged retaliatory acts complained of here include a *prolonged and organized campaign of harassment* by local police officers. Taken in the light most favorable to the plaintiffs, the record is replete with instances where the defendants followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs.") (emphasis added); Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla., 430 F. Supp. 2d 1296, 1316 (S.D. Fla. 2006) ("Numerous courts have found that harassment in the form of *constant* monitoring, investigating or issuance of violations can contravene First Amendment rights.") (emphasis added) (citations omitted).

The Eleventh Circuit Court of Appeals has recognized in other retaliation contexts, however, that "if there [is] a significant time gap between the protected expression and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism *or that the adverse action was the 'first opportunity' . . . to retaliate*." Jones v. Suburban Propane, Inc., 577 F. App'x 951, 955 (11th Cir. 2014) (emphasis added) (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) and quoting Dale v. Wynne, 497 F. Supp. 2d 1337, 1346 (M.D. Ala. 2007)); see also Bell, 2008 WL 868253, at *2 ("There must be a greater

temporal proximity *or other evidence of a causal connection* to link the protected conduct occurring [eighteen] months prior to the adverse action, as would be the case is most retaliation type analyses.")(emphasis added)(citations omitted). This theory informs Mr. Gibbons' allegation that "[b]efore arresting Gibbons for obstruction, [Officer] Martin recognized him from the 2010 stop and knew he had filed an internal affairs investigation, because he had been interviewed by [POS] Turner as a result of it." (Am. Compl. ¶ 128.) Indeed, Mr. Gibbons argues that his case is distinct from retaliation in the employment context "because employers have the opportunity to take adverse employment actions against an employee on practically any work day . . . , but [Officer] Martin did not have an opportunity to retaliate again[st] Gibbons until he came into contact with him during the 2012 stop."[14] (Pl.'s Resp. at 13.)

The Court finds, at this stage, the allegations taken as a whole are sufficient to establish causation. Therefore, the Court **DENIES** Defendants' motion as to this count. The Court

[14] The Court notes, however, that Jones is an unpublished opinion, which is not controlling authority and is persuasive only insofar as its legal analysis warrants. Bonilla v. Baker Concrete Const., Inc., 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). Moreover, to the extent the Court can discern, the Eleventh Circuit has not recognized the "first opportunity" theory in the § 1983 context, and Jones has been cited in only one decision: a Florida district court's footnote about whether a plaintiff is required to establish but-for causation at the prima facie stage of a retaliation suit brought pursuant to 42 U.S.C. § 1981 and the Florida Civil Rights Act, Lewis v. City of St. Petersburg, No. 8:14-CV-2547-T-27TGW, 2015 WL 3618525, at *4 (M.D. Fla. June 9, 2015).

will not address whether qualified immunity protects Officer Martin from liability as to this claim as he did not raise the defense in brief.

### 3. *Count VII – Malicious Prosecution Against Chief McBride, POS Turner, and Officers Martin and Jackson*

Although not readily decipherable from the allegations in Count VII, Mr. Gibbons appears to assert both a (1) standalone § 1983 claim for malicious prosecution against Officers Martin and Jackson, POS Turner and Chief McBride individually and (2) conspiracy to maliciously prosecute claim. (See Am. Compl. ¶¶ 131, 132, 138-141, 146 (framing the claim as against "[t]wo or more of the Defendants" and individuals' actions "as part of the conspiracy and plan"); Pl.'s Sur-Reply at 13 ("Assuming *arguendo* that the allegations of conspiracy — as opposed to malicious or wrongful prosecution itself — have not been sufficiently plead, Claims VII and VIII asserting malicious prosecution and wrongful prosecution have still been plausibly plead against each of [the] Defendants.").) The Court will address the conspiracy claim separately in Part III.D.4, infra.

The Eleventh Circuit has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983. Wood v. Kesler, 323 F.3d 872, 881 & n.14 (11th Cir. 2003) (citations omitted). "To establish a § 1983 malicious prosecution claim, the

plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; *and* (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." Grider, 618 F.3d at 1256 (emphasis in original) (citing Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004)). "As to the first prong, the constituent elements of the common law tort of malicious prosecution [are]: '(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.'" Id. (quoting Wood, 323 F.3d at 882). Under Georgia law, malice may be inferred from "a total lack of probable cause." O.C.G.A. § 51-7-44; see also K-Mart Corp. v. Coker, 261 410 S.E.2d 425, 429 (Ga. 1991). "As to the second prong, it is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment." Grider, 618 F.3d at 1256 (citations omitted).

Tracking the required elements of the common law tort of malicious prosecution, Mr. Gibbons alleges that Officer Martin arrested him for obstruction. (Am. Compl. ¶¶ 82.) Next he asserts that the March 2012 traffic stop, based solely on Mr. Gibbon's paper dealer tag, was not supported by probable cause. (See id. ¶¶ 52, 54.) He further alleges that "[t]here was no probable cause to arrest [him] for obstruction" because he

merely requested "to drive to a nearby, well-lit convenience store" and "rolled down his window a couple inches, sufficient for conversing with [Officer] Martin and exchanging license and registration." (Id. ¶¶ 68, 69; see also id. ¶¶ 82-88.) Additionally, Mr. Gibbons contends Officer Martin acted intentionally and maliciously, as the arrest was in retaliation for Mr. Gibbons' 2010 internal affairs complaint and for "calling the Richmond County Police Department to complain" about the stop as it occurred. (Id. ¶¶ 124, 128.) Mr. Gibbons was acquitted of obstruction on July 11, 2013. (Id. ¶ 135.) Mr. Gibbons also complains that he "was required to hire counsel to defend himself" at great expense and "suffered mental anguish and distress as a result of being wrongfully prosecuted." (Id. ¶¶ 133, 134.) Second, assuming Mr. Gibbons' version of events at this juncture, he also has shown a Fourth Amendment constitutional violation for his seizure without arguable probable cause. Thus, the Court finds that Mr. Gibbons adequately states a claim for malicious prosecution against Officer Martin.

As to the other Defendants, Mr. Gibbons appears to contend they "continued" the prosecution against him by submitting false evidence and, as to Chief McBride, pursuing the charge even after acquiring knowledge that it was bogus. (See Pl.'s Resp. at 14.) Williams v. Miami-Dade Police Dep't, 297 F. App'x 941,

947 (11th Cir. 2008); Kjellsen v. Mills, 517 F.3d 1232, 1238 (11th Cir. 2008); Spadaro v. City of Miramar, 855 F. Supp. 2d 1317, 1342 (S.D. Fla. 2012). Specifically, Mr. Gibbons alleges Officer Jackson lied about there being no tag whatsoever on Mr. Gibbons' car (Am. Compl. ¶¶ 140) and Mr. Gibbons "sho[oting] Martin the bird" immediately prior to the stop "knowing that the statement was false," (id. ¶ 139) thereby "causing the malicious prosecution" to proceed (see id. ¶¶ 130, 145). Although the Court has serious reservations about the causal link between Officer Jackson's alleged act — fabricating evidence about the *initiation of the traffic stop* — and the obstruction charge later going to trial, it nonetheless finds Mr. Gibbons has satisfied the common law elements of malicious prosecution as to Officer Jackson at this stage. See Spadaro, 855 F. Supp. 2d at 1342 (S.D. Fla. 2012) (finding the plaintiff's allegations "that Defendants knowingly fabricated evidence, filed false police reports, and conspired to convict him of a crime they knew he did not commit," he plead all the necessary elements of a malicious prosecutions claim under § 1983).

The Amended Complaint, however, is bereft of factual allegations implicating Chief McBride and POS Turner. The sole allegation against POS Turner under Count VII is that her "findings . . ." covered up Martin's policy violations" and his lies. (Am. Compl. ¶ 142.) Elsewhere in the Amended Complaint,

he contends repeatedly that POS Turner was incompetent "and/or" with "actual evil motive, decided to help Martin cover up the purposefulness *of his third, fourth, and fifth pull of the taser trigger,*" not the propriety of the obstruction charge. (Id. ¶¶ 108, 111, 112.) Mr. Gibbons argues that "Turner's finding that Martin did nothing wrong in the 2012 incident . . . gives rise to an inference that Turner agreed with Martin to maliciously prosecute Plaintiff by passing on to the prosecutor fabricated evidence under the guise of an investigatory finding." (Pl.'s Resp. at 14.) Notwithstanding that Mr. Gibbons injected this last "fact" — POS Turner's connection to or interaction with the prosecutor — into the argument without pleading it, incompetently carrying out an investigation does not, without more, give rise to the inference that POS Turner improperly influenced the decision to prosecute Mr. Gibbons for obstruction or acquired knowledge that the charge against Mr. Gibbons was inappropriate and failed to speak up. Simply put, there is no allegation in the Amended Complaint that would support a finding of malice.

Similarly, Mr. Gibbons alleges in Count VII that Chief McBride "reviewed without objection" POS Turner's findings, did not correct them, and then allowed her to testify about her findings. (Am. Compl. ¶¶ 114, 143, 144.) He argues that these acts "give[] rise to the inference that he informally agreed

with Turner to maliciously prosecute Plaintiff." (Pl.'s Resp. at 14.) The Court comes to the same conclusion with Chief McBride as it did with POS Turner: in the absence of any allegations that Chief McBride discovered information that exculpated Mr. Gibbons and concealed it, Mr. Gibbons' inferences present far too great of a leap. Cf. Diaz-Martinez v. Miami-Dade Cnty., No. 07-20914-CIV, 2009 WL 2970471, at *14 (S.D. Fla. June 9, 2009)(alleging a supervisor *personally participated* in officers' fabrications by signing off on a fabricated report, which documented a subordinate officer's extensive post-arrest conversation with the plaintiff in English despite *knowing* that the plaintiff spoke little or no English), R&R adopted in part, No. 07-20914-CIV, 2009 WL 2970468 (S.D. Fla. Sept. 10, 2009).

Accordingly, Defendants' motion to dismiss this claim is **GRANTED** as to Chief McBride and POS Turner. The Court will not address whether qualified immunity protects Officer Martin from liability as to this claim as he did not raise the defense in either brief. Nor will the Court address Officer Jackson's claim of qualified immunity. Defendants merely invoke Officer Jackson's name in the first sentence of two paragraphs setting forth the legal standard for qualified immunity. (Defs.' Br. at 23.) Their subsequent argument about whether Defendants' acts were within their discretionary authority does not address Officer Jackson's specific actions — here, fabricating evidence

or presenting false testimony — but rather the conduct of GRU Police Bureau *supervisors*, i.e. investigating citizen complains, assigning investigators to carry out such investigations, implementing policies, training officers, etc. (See Defs.' Reply at 8.) The Court, therefore, **DENIES** Defendants' motion to dismiss Mr. Gibbons' malicious prosecution claim against Officers Martin and Jackson.

   4.   *Counts VII & VIII - Conspiracy to Deprive Mr. Gibbons of His Fourth and First Amendment Rights via Retaliatory Prosecution Against Officers Martin, Turner, McBride, and Jackson*

To establish a conspiracy claim under § 1983, a plaintiff must allege three elements: "(1) a violation of [his] federal rights; (2) an agreement among the Defendants to violate such a right; and (3) an actionable wrong." Hoelper v. Coats, No. 8:10-CV-01324, 2010 WL 4292310, at *5 (M.D. Fla. Oct. 27, 2010) (citing Geidel v. City of Bradenton Beach, 56 F. Supp. 2d 1359, 1367 (M.D. Fla. 1999)); see also Conway, 2013 WL 5493380, at *5 (citing Valentine v. Bush, No. 2:10-CV-0097-RWS, 2012 WL 27416, at *5 (N.D. Ga. Jan. 4, 2012)). Mere "conclusory, vague and general" allegations of conspiracy are not sufficient to survive a motion to dismiss; rather, "a defendant must be informed of the nature of the conspiracy which is alleged." Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984).

The Eleventh Circuit has explained that "the linchpin for conspiracy is agreement, which presupposes communication." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1122 (11th Cir. 1992). "[A]n agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, 637 F.3d 1178, 1192 (11th Cir. 2011); see also Grider, 618 F.3d at 1260 (stating that "[f]actual proof of the existence of a § 1983 conspiracy may be based on circumstantial evidence" (citing Burrell v. Bd. of Trs. of Ga. Military Coll., 970 F.2d 785, 789 (11th Cir. 1992)). As a guide, our sister court has found that a plaintiff alleges sufficient facts to state a claim for § 1983 conspiracy where: (1) plaintiff alleged all defendants actively participated in the events leading up to the alleged constitutional violation, (2) plaintiff alleged all defendants "acted in concert" when the constitutional violation was committed, and (3) "[t]he Amended Complaint [is] replete with allegations that the Defendants communicated with one another and actively participated with one another" leading up to and during the event in question. Conway, 2013 WL 5493380, at *5 (citing Valentine, 2012 WL 27416, at *6).

Here, Mr. Gibbons alleges that Chief McBride, Officers Martin and Jackson, and POS Turner conspired to facilitate his

prosecution for obstruction after the March 2012 traffic stop. (Am. Compl. ¶ 131.) Specifically, he claims that Officer Martin lied about engaging Mr. Gibbons in dialogue before he deployed the taser (id. ¶ 137) and Mr. Gibbons rolling up the window on his hand (id. ¶ 138). According to Mr. Gibbons, Officer Jackson lied about there being no tag whatsoever on Mr. Gibbons' car (id. ¶ 140) and Mr. Gibbons flashing Officer Martin the bird immediately prior to the stop (id. ¶ 139). Mr. Gibbons also asserts that Officer Turner investigated the March 2012 stop and "incompetently believed" Officer Martin by failing to review the video evidence or with "evil motive" "decided to help Martin cover up the purposefulness of" the third, fourth, and fifth tasings. (Id. ¶ 111.) Finally, Officer McBride reviewed Officer Turner's investigation without objection. (Id. ¶ 143.) All in all, these Defendants executed a "plan" "to cause the malicious prosecution of Mr. Gibbons" (id. ¶ 131), "to cover up [Officer] Martin's misconduct" (id. ¶¶ 137-42), and to "chill protected First Amendment activity" (id. ¶ 158) or "prevent . . . a subsequent civil rights case against any Defendant" (id.).

Defendants contend that Mr. Gibbons' failure "to identify specific facts plausibly suggesting an agreement" or "facts supporting a meeting of the minds" is fatal to his conspiracy claims. (Defs.' Br. at 13.) Indeed, the Amended Complaint

71

lacks allegations that Defendants "communicated with one another" about Mr. Gibbons — his traffic stops, internal affairs complaints, or prosecution — or Officer Martin's purported misconduct. As such, Mr. Gibbons' conspiracy claims as presented are weak in that they merely "string[] together adverse acts of individuals." See Hein v. Kimbrough, 942 F. Supp. 2d 1308, 1313 (N.D. Ga. 2013) (citing Harvey v. Harvey, 949, F.2d 1127, 1133 (11th Cir. 1992)).[15]

The Court, however, does not find this deficiency to be dispositive at the motion to dismiss stage. Indeed, that the above-mentioned officers reached an agreement to violate Mr. Gibbons' constitutional rights may be *inferred from their relationship* as members of the GRU Police Bureau and the *totality* of their conduct related to the arrests, investigations, and prosecutions. The chronology of events and the commonality of actors between the September 2010 and March 2012 stops are sufficient, for now, to state a circumstantial claim by the slimmest of margins that the officers within the GRU Police Bureau were working in concert with one another to prosecute Mr. Gibbons in retaliation for exposing officer misconduct.

---

[15] Moreover, the allegations of silence or inaction on the part of Chief McBride do not support the inference that he conspired with Officers Martin and Jackson and POS Turner to violate Mr. Gibbons' constitutional rights. See Myers v. Bowman, 713 F.3d 1319, 1322 (11th Cir. 2013).

Defendants nevertheless counter that the intracorporate conspiracy doctrine bars Mr. Gibbons' conspiracy claims. (Defs.' Br. at 13-14.) "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." Grider, 618 F.3d at 1261 (quoting McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc)). "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." Id.; see also Denney v. City of Albany, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (stating "the only two conspirators identified . . . are both City employees; no outsiders are alleged to be involved" and concluding intracorporate conspiracy doctrine barred plaintiffs' § 1985(3) conspiracy claims for deprivation of their equal protection rights). The doctrine applies to public governmental entities and their personnel. See Rehberg v. Paulk, 611 F.3d 828, 854 (11th Cir. 2010); Denney, 247 F.3d at 1190; Albra v. City of Fort Lauderdale, 232 F. App'x 885, 891 (11th Cir. 2007); Dickerson v. Alachua Cnty. Comm'n, 200 F.3d 761, 767-68 (11th Cir. 2000); Chambliss v. Foote, 562 F.2d 1015 (5th Cir. 1977).[16]

---

[16]    See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981 are binding precedent in the Eleventh Circuit).

Defendants are law enforcement officers with the GRU Police Bureau. Mr. Gibbons does not allege that outsiders are involved. The subject of their alleged conspiracy — prosecution of Mr. Gibbons by making a false obstruction charge — involves job-related functions well within their scope of employment as police officers notwithstanding the purported constitutional infirmity of their conduct: "law enforcement officers are empowered precisely to prosecute violations of law."[17] See Grider, 618 F.3d at 1261-62 (finding the intracorporate conspiracy doctrine barred the plaintiff's § 1983 conspiracy claim based on a false bribery charge and prosecution and explaining that the "inquiry is not whether [the police officer] had the authority to prosecute in an unconstitutional manner and with malicious intent, but instead whether engaging in prosecutions is part of [the officer's] job-related powers and responsibilities").

The Eleventh Circuit, however, has enunciated, but not fully adopted three exceptions to the doctrine. Grider, 618 F.3d 1263. The intracorporate conspiracy doctrine may *not* bar a plaintiff's claim where (1) the participants' conduct violates

_____

[17]    In a footnote, Mr. Gibbons argues that the intracorporate conspiracy doctrine does not apply because the relevant Defendants were not acting within the scope of their employment. (Pl.'s Resp. at 15 n.24.)  Although some courts recognize that where agents act far outside the course of employment, it may be possible for them to form a conspiracy, see Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 841 (6th Cir. 1994), the Eleventh Circuit's decision in Grider, which addresses claims indistinguishable from those presented by Mr. Gibbons, forecloses such an argument here.

the federal criminal code, McAndrew, 206 F.3d at 1034; (2) "the employee has an 'independent personal stake' in his unconstitutional acts and is not acting to further the corporation's illegal objective," Grider, 618 F.3d at 1262; and (3) "the employees 'engage in a series of discriminatory acts as opposed to a single action' over a significant period of time in the employment setting," id. (quoting Dickerson, 200 F.3d at 768-70).

Mr. Gibbons invokes the first exception in brief, although nowhere in the Amended Complaint does he allege that the conduct at issue here could give rise to criminal charges against Defendants. A complaint may not be amended by briefs in opposition to a motion to dismiss. Huls v. Llabona, 437 F. App'x 830, 832 n.5 (11th Cir. 2011) (holding that an argument raised for the first time in response to defendant's motion to dismiss, instead of in an amended complaint, was not properly raised before the district court and would not be considered on appeal); McKally v. Perez, No. 14-22630-CIV, 2015 WL 758283, at *6 (S.D. Fla. Feb. 6, 2015); Fleming v. Dowdell, 434 F. Supp. 2d 1138, 1148 n.9 (M.D. Ala. 2005) (finding dismissal of the Fourth Amendment claim was proper because "[a] complaint may not be amended by briefs in opposition to a motion to dismiss or motion for summary judgment")(citations omitted). Notwithstanding this error, the Court puts the issue to rest.

In his response brief, Mr. Gibbons argues that Defendants' conduct violated 18 U.S.C. § 1512, which prohibits witness tampering, and the criminal fraud conspiracy provisions of 18 U.S.C. § 371. (Pl.'s Resp. at 15.) 18 U.S.C. § 1512(b)(1) makes it a crime to "knowingly use[] intimidation . . . or corruptly persuade[] *another person* . . . with intent to . . . influence the testimony of any person in an official proceeding." Id. (emphasis added). As the Court previously mentioned, Mr. Gibbons alleges no facts in the Amended Complaint to support 18 U.S.C. § 1512(b)(1)'s application. That Defendants purportedly lied about various facts or ratified sub-par internal investigations does not give rise to the inference that *each of them* intimidated or corruptly influenced *the other* to testify falsely. Moreover, the "official proceeding" about which Mr. Gibbons complains was not "before a judge or court *of the United States*," Congress, a federal agency, or insurance regulators as required by the statute. 18 U.S.C. § 1515(a)(1) (emphasis added).

18 U.S.C. § 371 makes it unlawful "to commit any offense *against the United States*, or to defraud *the United States,* or any agency [*of the United States*]." Id. (emphasis added). Again, Mr. Gibbons alleges no facts in the Amended Complaint to support 18 U.S.C. § 371's application.

As Mr. Gibbons does not address the other two exceptions to the intracorporate conspiracy doctrine, neither will the Court. Defendants' motion to dismiss Counts VII and VIII based on the intracorporate conspiracy doctrine is due to be **GRANTED**.

5. *Count IX - "First Amendment Claim Under The Same Facts As The Fourth Amendment Claim For Unlawful Stop For Paper Tag"*

Count IX of the Amended Complaint consists of a single paragraph:

> The same facts underlying Claim I, incorporating herein ¶ 48-63, supports a claim for deprivation of a First Amendment right of Gibbons' freedom of movement and travel, protected as a liberty interest under the Fourteenth Amendment, so one of the injuries caused by the Fourth Amendment deprivation is damages associated with the deprivation of the right to travel.

(Am. Compl. ¶ 154.) Unsurprisingly, by way of a footnote, Mr. Gibbons clarifies that "Claim IX of the complaint . . . is only intended to add First Amendment freedom of movement and right to travel damages to the Fourth Amendment false stop asserted in Claim I." (Pl.'s Resp. at 2 n.5.)

The Court has read Count IX — including all that it purports to incorporate — and agrees with Defendants: it is not clear what claim is being made or against whom. Mr. Gibbons received explicit instructions from the Court in its October 27, 2014 Order about the manner in which he was expected to present his claims upon re-pleading (Doc. 38 at 8-9) and Count IX does

not conform to those standards. The Court will not draft a conforming claim for him. Accordingly, the Court **DISMISSES** Claim IX. <u>See</u> <u>Byrne v. Nezhat</u>, 261 F.3d 1075, 1129-34 (11th Cir. 2001) (discussing shotgun pleadings and approving of dismissal as a remedy when a party fails to cure the deficiency), <u>abrogated on other grounds by</u> <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639 (2008).

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Partial Motion to Dismiss. (Doc. 42.) The relevant holdings are as follows:

1. Counts I, II, IV, V, VI, and VII against Officer Martin in his individual capacity **SHALL PROCEED**;[18]

2. Count I against Defendant McBride in his individual capacity, solely with respect liability for failure to train regarding unlawful stops, **SHALL PROCEED**; and

3. Count VII against Defendant Jackson in his individual capacity, as a standalone claim for malicious prosecution, **SHALL PROCEED**.

The remaining claims, as listed herein, are **DISMISSED**:

1. Counts I, II, III, IV, and V against Defendants Maxwell, Black, Skinner, and Turner;

2. Count I against Defendant McBride with respect to liability for failure to train regarding excessive force;

3. Count III against Defendant McBride;

---

[18]    As explained in Part III.D.1, <u>supra</u>, Count III against Officer Martin is subsumed into Counts I and II.

4.    Count VII, as a standalone claim for malicious prosecution, against Defendants McBride and Turner;

5.    The conspiracy claims identified in Counts VII and VIII as to all Defendants;

6.    Counts IX, X, XI, XII, XIII, XIV, and XV as to all Defendants;

7.    All claims against John Doe or Jane Doe; and

8.    All official capacity claims as to all Defendants, except for Phillip Wilheit, Sr. as Chair of the University System of Georgia Board of Regents.

The Court **DIRECTS** the Clerk to **TERMINATE** Defendants Maxwell, Black, Skinner, Turner, and John/Jane Doe as parties, as well as all deadlines and motions pertaining to them. Defendants **SHALL** have **FOURTEEN DAYS** to file an answer to Mr. Gibbons' Amended Complaint. The parties **SHALL** submit a discovery plan within **THIRTY DAYS** of the date of this Order.

Finally, the Court **CAUTIONS** Mr. Gibbons' counsel, John P. Batson, against using excessive footnotes to evade the 26-page limit for motions filed in this Court. See LR 7.1(a), SDGa. If he continues to use footnotes in this manner, his briefs will, at the Court's discretion, either be rejected as unacceptable for filing or dismissed with leave to be refiled in proper form.

The Court further **CAUTIONS** Mr. Batson against abusive use of the sur-reply brief. Although this district's local rule on the filing of supplemental briefs is permissive, Podger v.

Gulfstream Aerospace Corp., 212 F.R.D. 609, 609 (S.D. Ga. 2003), "liberally allowing filing of [sur] reply briefs does not abrogate the purpose of reply briefs." Royal v. New York Life Ins. Co., No. 6:10-CV-104, 2015 WL 339781, at *6 (S.D. Ga. Jan. 26, 2015). "The purpose of a sur reply is to rebut arguments advanced in an opposing party's reply brief or explain a position that the opposing party has attempted to refute," id. (emphasis added)(citation omitted). The sur-reply brief may not be used to take another bite at answering an opposing party's motion for summary judgment — becoming nothing more than a 26-page extension of the response brief — nor should it be employed as a tactical device to ensure that the plaintiff steals the final word. As with the Court's warning on footnotes, if counsel continues to game the Court's liberal sur-reply brief policy, he will be required to move in writing for permission to file such briefs, succinctly specifying the reasons why additional briefing is necessary.

ORDER ENTERED at Augusta, Georgia, this 21ˢᵗ day of August, 2015.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA